UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 91-8416

_____


MARIA VEGA, EVA TREVINO,
on behalf of herself and as
next friend of PEDRO TREVINO,
ET AL.,

                                        Plaintiffs-Appellees

                        versus

JOHN W. GASPER,

                                        Defendant-Appellant

_____

Appeal from the United States District Court for the
              Western District of Texas
_____

(October 14, 1994)


Before REYNALDO G. GARZA and GARWOOD, Circuit Judges, and
ROSENTHAL,[*] District Judge.

GARWOOD, Circuit Judge:

        Defendant-appellant, John W. Gasper (Gasper), appeals the
district court's judgment following a bench trial in favor of
plaintiffs-appellees, seasonal farm workers, under the Fair Labor
Standards Act, 29 U.S.C. § 201 *et seq*. (FLSA), and the Migrant and
Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et*

_____

[*]    District Judge of the Southern District of Texas, sitting by
designation.

*seq.* (AWPA).[1]

The district court awarded nine plaintiffs recovery under the FLSA at minimum wage rates for their time spent traveling to and from the farm where they worked, and for their time waiting at the farm before and after working, for none of which Gasper had compensated them. FLSA recovery was also awarded these plaintiffs for the amount below minimum wage levels that Gasper had paid them for their working time at the farm. Liquidated damages under the FLSA were also awarded these plaintiffs, and attorneys' fees were assessed against Gasper.[2] Gasper's appeal challenges only the awards for travel and wait time and the related portion of the liquidated damages.

We hold that the workers' travel time is not compensable under the FLSA. We remand for additional fact findings concerning the compensability of the workers' wait time and for recalculation of the FLSA damage award. Because we are reducing the FLSA damage award, we also remand for recalculation of damages under the AWPA.

### APPELLEES' SUGGESTION OF MOOTNESS

Before turning to the merits, we address appellees' suggestion of mootness, which Gasper has opposed. It appears that after this appeal was perfected Gasper filed for protection under Chapter 13 of the Bankruptcy Code. Plaintiffs promptly filed an unsecured

---

[1]    Plaintiffs-appellees also filed a notice of appeal, but subsequently dismissed their cross-appeal.

[2]    Some 75 other plaintiffs, who had no recovery under the FLSA, were each awarded $50 under the AWPA, 29 U.S.C. § 1854(c). The plaintiffs who recovered under the FLSA did not recover under section 1854(c).

claim in the bankruptcy court based on the entire judgment below ($61,309.30). A few weeks later, the bankruptcy court, on the joint motion of Gasper and plaintiffs "and after noting the Ch. 13 bankruptcy trustee's approval," entered an order referring to the present appeal and decreeing that:

> "the automatic stay of Section 362(a) of the Bankruptcy Code is terminated for the limited purpose of permitting the Debtor [Gasper] and the Farmworkers [plaintiffs] to proceed with the above described appeal and in order that the Fifth Circuit may decide and issue its opinion and judgment regarding the Debtor's appeal, but the automatic stay shall otherwise remain in effect as to all other actions against the Debtor, to include any attempt to collect or proceed against the Debtor on any judgment already rendered or which may be modified as a result of the appeal."

Subsequently, after this appeal was orally argued, on Gasper's motion his bankruptcy proceeding was converted from Chapter 13 to Chapter 7. Several months later, plaintiffs filed an adversary proceeding in the bankruptcy court objecting under 11 U.S.C. § 523(a)(6) to the dischargeability of Gasper's judgment debt to them "for failure to pay the minimum wage and for costs and attorneys' fees arising therefrom." The adversary stated it related to "unpaid minimum wages for time spent harvesting" but "does not include the amount of money awarded for travel and waiting time, which Plaintiffs do *not* seek to be determined non-dischargeable." This adversary is apparently still pending before the bankruptcy court. Some weeks later, the bankruptcy court entered an order discharging Gasper, and stating:

> "1. The above-named debtor is released from all dischargeable debts.
>
> 2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a

3

determination of the personal liability of the debtor with respect to any of the following:

(a) debts dischargeable under 11 U.S.C. Sec. 523;

(b) unless heretofore or hereafter determined by order of this court to be nondischargeable, debts alleged to be excepted from discharge under clauses (2), (4) and (6) of 11 U.S.C. Sec. 523(a);

(c) debts determined by this court to be discharged."

Several months thereafter plaintiffs filed in this Court their "Suggestion of Mootness," contending that "this Appeal is now moot" because Gasper has been discharged from the only obligations at issue on this appeal, the travel and wait time. Subsequently, plaintiffs have filed an affidavit of the bankruptcy trustee indicating that the estate is still being administered, that unsecured creditors have received no distribution from the estate but it is possible that some distribution will be made to them on their claims, and stating "I do not believe there is any reason to continue with the appeal" and "I believe the matter is more properly the subject of the claims objection process in the Bankruptcy Court."[3]

We conclude that the appeal is not moot. Certainly it will affect what plaintiffs may recover from the bankruptcy estate.[4]

---

[3] No authority is cited to support this latter statement, and we do not agree with it. If this Court determines that plaintiffs are not entitled to recover some or all of their claims at issue on this appeal, those claims will be invalid.

[4] Gasper, in addition to contending the appeal is not moot, alternatively suggests that if it is moot then, under *United States v. Munsingwear, Inc*., 340 U.S. 36, 39-40 (1950), we should vacate the judgment on the appealed claims and remand with directions to dismiss them as moot. We reject that suggestion,

Assuming, as appears to be the assumption of the parties but has not been expressly stated or reflected by any of the material filed with us, that the liabilities of the estate exceed its assets, then what other unsecured creditors will receive will also be affected by this appeal. If the mentioned assumption is not accurate, or would not be accurate were Gasper to prevail on all issues he raises on appeal, then the appeal will clearly affect what Gasper receives from the estate. Moreover, if plaintiffs prevail in their objection to dischargeability (or if any other creditors successfully object to the dischargeability of any debt), then Gasper will be affected because if he prevails on appeal the undischarged debt or debts will be reduced below what they otherwise would be by application of estate funds which would otherwise be applied to the debts at issue on this appeal. *Cf. Abel v. Campbell*, 334 F.2d 339, 341 (5th Cir. 1964) ("Because the tax liability survives . . . the bankruptcy, the bankrupt has standing to attack the proof of claim before the Referee and a right to appeal an adverse judgment as would an ordinary creditor"); *Matter of Dooley*, 41 B.R. 31, 33 (Bank. N.D. Ga. 1984) (debtor has standing to object to claim); *In re McCorhill Pub., Inc.*, 89 B.R. 393, 396 (Bank. S.D.N.Y. 1988) ("a debtor has standing to object to claims where disallowance of the claims would produce a surplus"). We conclude that the case is not moot in the sense of no longer presenting a case or controversy. *See also Cox*

---

as it would improperly deprive plaintiffs (without any adjudication of the merits) of the judgment on which their bankruptcy claims (which, if valid, they may be able to collect something on) are founded.

5

*v. Sunbelt Sav. Ass'n of Texas*, 896 F.2d 957, 959-60 (5th Cir. 1990); *Triland Holdings & Co. v. Sunbelt Service Corp.*, 884 F.2d 205, 208 (5th Cir. 1989); *Ratner v. Sioux Natural Gas Corp.*, 770 F.2d 512, 516 (5th Cir. 1985).

We recognize, of course, that where a debtor is in bankruptcy a suit against the debtor for a post-petition debt must make the trustee a defendant. *Bellini Imports v. Mason and Dixon Lines, Inc.*, 944 F.2d 199, 201-202 (4th Cir. 1991). Suits against the debtor commenced before bankruptcy or on pre-petition claims are stayed by the automatic stay of 11 U.S.C. § 362(a). Here, however, there was no bankruptcy until after Gasper had perfected the instant appeal. Subsequently, the bankruptcy court, on motion of Gasper and plaintiffs, and with the approval of the Chapter 13 trustee, lifted the automatic stay for the specific purpose of allowing Gasper "to proceed with" this appeal "in order that the Fifth Circuit may decide and issue its opinion and judgment regarding the Debtor's [Gasper's] appeal." The subsequent conversion to Chapter 7 did not invoke another automatic stay or modify this order. *See In Re Parker*, 154 B.R. 240, 243 (Bank. S.D. Ohio, W.D., 1993) ("the conversion of the debtors' Chapter 7 case to Chapter 13 did not cause the stay to be reimposed and that conversion did not affect this court's earlier order granting relief from stay"); *Matter of Winslow*, 39 B.R. 869, 871 (Bank. N.D. Ga. 1984) ("An order which lifts the automatic stay returns the parties to the legal relationships which existed before the stay became operative"). Of course, the general rule is that "once a trustee is in a bankruptcy case, the trustee, not the debtor or the

6

debtor's principal, has the capacity to represent the estate and to sue and be sued. . . ." *In Re Gulph Woods Corp.*, 116 B.R. 423, 428 (Bank. E.D. Pa. 1990). This principle, however, is not without exceptions. *See id*. at 429-430. Plainly, its purpose is to allow the trustee to collect and protect the estate and avoid unnecessary estate expenses. Here, dismissing the appeal as moot could not possibly subserve any of these purposes, and we note that the trustee has never moved to intervene in this appeal or to have the appeal dismissed.

In *Smith v. State Farm Fire and Cas. Co.*, 633 F.2d 401 (5th Cir. 1980), a fire insurance policyholder owning a life estate in an insured building destroyed by fire successfully sued the insurance company to recover on the policy. When the suit was commenced, and at all times thereafter, this plaintiff was in bankruptcy. However, the trustee in bankruptcy was not made a party, and the insurance company, after verdict for the insured, unsuccessfully moved to have the suit dismissed because the trustee was not a party. The insurance company appealed the adverse judgment, again urging that the suit should have been dismissed because the trustee was not a party. We affirmed, stating:

> "The absence of the trustee in no legal way affects the according of complete relief to those already parties. Neither is the trustee's ability to protect his interest in the life estate significantly impaired. It is clear from the record that the trustee was aware of this litigation yet did not attempt to be made a party. He instead secured an order of the bankruptcy court requiring Gladys Smith to pay the trustee the value of the life estate from any proceeds of this action." *Id*.

7

at 405.[5]

*See also Kelly v. Commercial Union Insurance Co.*, 709 F.2d 973, 978 (5th Cir. 1983).

The present appeal is analogous to *Smith*. The bankruptcy court lifted the automatic stay and allowed Gasper to pursue his appeal to conclusion in this Court; the Chapter 7 trustee has long been aware of the appeal and has never sought to intervene nor sought to have it dismissed; prosecution of the appeal is without expense to the estate and can only benefit the estate; and any relief on appeal which Gasper achieves will automatically inure to the benefit of the estate, as well as indirectly to Gasper's benefit (either by producing a surplus or by reducing the amount of any debtSQsuch as that which is the subject of plaintiffs' pending adversary proceedingSQfound nondischargeable).

Accordingly, we reject the suggestion of mootness. We turn now to the merits.

## MERITS

### Facts and Proceedings Below

Gasper is a farm labor contractor. Farmers hire Gasper and other contractors to employ, transport, supervise, and pay the farm workers whom the contractors recruit.

Gasper recruited workers for the 1983-84 chile pepper harvest.

---

[5]    We also observed that the judgment made the life estate award payable to the trustee, that the insurance company's potential liability was limited to the sum specified in the policy, and that "a letter from the bankruptcy trustee to the district court, placed in the record by State Farm, . . . indicates . . . [the trustee] would be satisfied by the amount specified by the jury as the value of the life estate." *Id*.

Gasper had a "day haul operation" in which potential workers who hoped to be hired that day would assemble at a pickup point. Each worker was employed on a daily basis and would be rehired each day that the worker arrived at the pickup point on time (provided there was sufficient available work).

The workers furnished their own transportation from their homes, usually in Juarez, Mexico, to El Paso, Texas, where Gasper would meet them. The last bus from Juarez arrived in El Paso at midnight. Initially, Gasper's bus would meet the workers in El Paso between 1:00 A.M. and 2:00 A.M. and depart shortly thereafter. Based on the workers' desire to avoid the dangers of El Paso streets in the early morning, Gasper soon arranged for the bus to arrive at the El Paso pickup point between 11:00 P.M. and midnight. The bus remained parked until Gasper arrived and departed for the fields between 1:00 A.M. and 1:30 A.M. A few workers would skip the pickup point and provide their own transportation to the fields.

Gasper was the workers' employer. He chose whom to hire, he owned the buses, he set the pay rate, he determined which field the workers picked, and he supervised the workers. Gasper owned two buses and used one or two daily depending on how many workers he needed. Gasper considered the workers hired if they were on his bus when it left the recruitment site. Until then, the driver could throw a work applicant off the bus and refuse to hire him or her. The bus trip to the fields lasted two to two-and-a-half hours. The bus would stop at a truck stop in Demming, New Mexico, where the workers who had money could buy coffee and use the

9

restroom.  This stop lasted between thirty minutes and an hour daily.  During the bus ride, usually at the Demming truck stop, the workers were told which of the different fields they would harvest that day.  After arrival at a field, the workers waited about an hour for the sun to rise before beginning work.  The workers were unable to use this wait time meaningfully for themselves because the fields were isolated and they lacked transportation.  They normally picked only one field per day.

During the day, they received a token from Gasper or one of his employees for each basket of peppers they picked.  At the end of the day, the workers waited two hours while Gasper counted the tokens for each worker and computed their pay.  During this time, Gasper or an employee cashed a check from the farmer, which was used to pay the workers in cash.  The employees could not use this time for themselves since they lacked transportation from the fields.  After this two hour wait, Gasper transported the workers back to the drop-off point in El Paso.  The trip home took two hours, and the workers returned to El Paso between 5:00 P.M. and 7:00 P.M.

Gasper did not always pay his workers the minimum wage for the hours they actually worked in the fields each day.  Gasper never paid the workers for the time spent traveling to work, nor for that waiting at the job site.  Gasper failed to keep the business records required by the AWPA.  In fact, Department of Labor records reveal that Gasper was fined for inadequate recordkeeping in 1981 and for other Department of Labor violations in 1979, 1980, and 1981.

10

Plaintiffs (the workers), a group of Gasper's regular workers, filed a class action suit seeking the minimum wage for their travel time, waiting time, and unpaid field-working time under the FLSA. They also sought compensation for Gasper's violations of the AWPA. 29 U.S.C. § 1831. The district court, following a bench trial, rendered judgment for the workers on all these claims and awarded additional liquidated damages under the FLSA.[6] Gasper appeals the award of wages and liquidated damages for the travel and wait time. He does not appeal the holding that he did not pay some of his workers the minimum wage for time spent picking chile peppers or the liquidated damages awarded respecting that time.

## Discussion

We will address the compensability of the workers' travel and waiting time separately, and then consider the issues of liquidated damages and damages under the AWPA.

I.   Travel Time

The workers spent at least four hours daily traveling to and from work. They seek the minimum wage for this travel time.

Under the FLSA, 29 U.S.C. § 206, employers must pay their employees the hourly minimum wage for time on the job. Under the "Portal-to-Portal Act," 29 U.S.C. § 254, employers do not have to pay the minimum wage to an employee for the following activities of the employee:

"(1) walking, riding, or traveling to and from

---

[6]   Gasper failed to keep adequate pay records as required by the AWPA, 29 U.S.C. 1831(c) (1988), so the court estimated the damages due to each plaintiff under *Belitz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1330-31 (5th Cir. 1985).

11

the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences or subsequent to the time on any particular workday at which he ceases, such principal activity or activities." 29 U.S.C. § 254(a).

Thus, employees are entitled to compensation for travel time that is a principal activity of the employee. The question for us is whether the travel time of these farmworkers to and from the fields is a compensable principal activity or a noncompensable preliminary or postliminary activity.

This Court traditionally has construed the term "principal activity" to include activities "performed as part of the regular work of the employees in the ordinary course of business. . . . [the] work is necessary to the business and is performed by the employees, primarily for the benefit of the employer . . . ." *Dunlop v. City Electric, Inc.*, 527 F.2d 394, 401 (5th Cir. 1976) (electricians' prework activities of preparing timesheets, supply requests, loading and cleaning trucks are principal activity).

Ordinary home-to-work travel is clearly not compensable under the Portal-to-Portal Act unless a contract or custom of compensation exists between the employer and the employees. 29 U.S.C. § 254; 29 C.F.R. § 785.34-35, 790.8(f) (1990). "An employee who travels from home before his regular workday and returns to his home at the end of the workday is engaged in ordinary home-to-work travel which is a normal incident of employment. This is true

12

whether he works at a fixed location or at different job sites. *Normal travel from home to work is not worktime*." 29 C.F.R. § 785.35 (1990) (emphasis added). "[R]iding on buses between a town and an outlying mine or factory where the employee is employed" is a preliminary or postliminary activity. 29 C.F.R. § 790.7 (1990); Sen. Rep. No. 48, 80th Cong., 1st Sess., at 48 (1947); *Ralph v. Tidewater Construction Corp.*, 361 F.2d 806, 808 (4th Cir.), *cert. denied*, 87 S.Ct. 294 (1966) (riding fifteen minutes to an hour by boat from shore to work is a preliminary noncompensable activity); *Dolan v. Project Construction Corp.*, 558 F.Supp. 1308, 1309-11 (D. Colo. 1983) (thirty minute ride from main camp on *employer* buses not compensable; intermittent receipt of work information during bus ride did not make ride compensable). "Travel time at the start or end of the workday . . . from home to work (or from the bridge at the border to the fields) need not be counted as hours worked . . . ." Wage & Hour Opinion Letter No. 1484 (Aug. 26, 1977), Lab. L. Rep. (CCH) (Transfer Binder, June 1973-Sept. 1978) ¶ 31,133, at 42,800 (D.O.L. Opinion).

Travel that is an indispensable part of performing one's job is a principal activity and is compensable. *Crenshaw v. Quarles Drilling Corp.*, 798 F. 2d 1345, 1359 (10th Cir. 1986) (travel time in specially equipped employer truck compensable); *Spencer v. Auditor of Public Accounts*, No. 90-5750 (6th Cir. 1991) (unpublished) (travel between job sites compensable, but not travel from home to different job sites on different days); *Wirtz v. Sherman Enterprises, Inc.*, 229 F.Supp. 746 (D. Md. 1964) (job site to job site indispensable and compensable). A district court

13

opinion states:

> "Where . . . an employee is required to report to a designated meeting place . . . to receive instructions before he proceeds to another workplace (such as the jobsites . . .), the start of the workday is triggered at the designated meeting place, and subsequent travel is part of the day's work and must be counted as hours worked for purposes of the FLSA, regardless of contract, custom, or practice." *Dole v. Enduro Plumbing, Inc.*, 117 Lab. Cas. (CCH) ¶ 35,418 (C.D. Cal. 1990) (plumbers paid for travel from check-in site at shop where they collected and loaded a few tools and rode in company-owned truck to job site).

"Where an employee is required to report at a meeting place to receive instructions *or* to perform other work there, or to pick up and to carry tools, the travel from the designated place to the workplace is part of the day's work, and must be counted . . . ." 29 C.F.R. § 785.38 (1990) (emphasis added). Travel between sites or from the last site to the office is compensable, but not travel from the last site home. *Id.*

Several facts have persuaded us that the travel time here was indisputably ordinary to-work or from-work travel and not compensable. The workers rode Gasper's buses to work and back. Unlike the plumbers in *Dole v. Enduro Plumbing*, 117 Lab. Cas. (CCH) ¶ 35,418, the workers here performed no work prior to or while riding on Gasper's buses. They did not load tools or engage in activities that prepared them or their equipment for picking chile peppers before or while riding the buses. The workers were told on the bus which field they would pick and what the pay rate would be each day. Merely receiving this information is not enough instruction from Gasper to render the time compensable. *See* 29 C.F.R. § 785.38 (1990); *Dolan*, 558 F.Supp. at 1309-11. The workers

14

were *not* required to use Gasper's buses to get to work in the morning. They chose where they lived and how to get to and from work. Not all of Gasper's field workers rode his buses. The fact that the travel time was so long does not make it compensable under the statute. *See* 29 C.F.R. § 790.7 (1990). That Gasper owned the buses or that he considered workers "hired" if they were on the buses when they left the pickup site does not matter under the statute. *See* Sen. Rep. No. 48, 80th Cong., 1st Sess., at 48 (1947); *Wirtz v. Flint Rig Co.*, 222 F.Supp. 707 (D. Mont. 1963) (that employer owned bus does not matter). We note that there was no travel between job sites after the workers began picking chile peppers. The travel time was just an extended home-to-work-and-back commute. We hold that the travel time here is a noncompensable preliminary and postliminary activity based on the Portal-to-Portal Act and related jurisprudence.

II. Wait Time

The workers urge that they are entitled to the minimum wage for their morning and afternoon wait time. The standard under the Portal-to-Portal Act for "wait time" is the same as for "travel time." Wait time is compensable when it is part of a principal activity of the employee, but not if it is a preliminary or postliminary activity. *See* text of 29 U.S.C. § 254, *supra*.

The legislative history of the Portal-to-Portal Act and several cases have addressed the issue of compensability of wait time as a principal activity. Normal "[c]hecking in or out and waiting in line to do so, changing clothes [for the employee's convenience], washing up or showering, [and] *waiting in line to*

15

*receive paychecks*" is *not* a principal activity. S. Rep. No. 48, 80th Cong., 1st Sess. p. 47 (1947) (emphasis added).

This Court considers two wait time factors. First, waiting time is compensable if the wait predominately benefits the employer. *Mireles v. Frio Foods, Inc.*, 899 F.2d 1407, 1411 (5th Cir. 1990). Waiting benefits the employer when it is requested or required by the employer. *Wirtz v. Sullivan*, 326 F.2d 946, 948 (5th Cir. 1964). "Where an employee is required by his employer to report to work at a specified time, and the `employee is there at that hour ready and willing to work but' is unable to . . . for some reason beyond his control, the employee is engaged to wait and is entitled to be paid for the time spent waiting." *Mireles*, 899 F.2d at 1414; *Halferty v. Pulse Drug Co.*, 864 F.2d 1185, 1189 (5th Cir. 1989). *See Sedano v. Mercado*, 124 Lab. Cas. (CCH) ¶ 35,756 (D.N.M. 1992) ("Time spent . . . waiting in the fields for the fields to dry . . ., for trailers to arrive, or for their employer to prepare to begin the work day is predominately for the benefit of the employer."); *Fields v. Luther*, 108 Lab. Cas. (CCH) ¶ 35,072, at 45,666 (D. Md. 1988) (*Time waiting in fields for dew to dry compensable because workers are on duty*); DOL Opinion Letter 1507, 1973-1978 [Transfer Binder] Lab. L. Rep. (CCH) ¶ 31,172, at 42,876 (Feb. 9, 1978). Second, "[w]hether idle time is compensable depends on whether employees are able to effectively use the time for their own purposes, not on the 'reasonableness' [in duration] of the wait." *Mireles*, 899 F.2d at 1413; *Halferty*, 864 F.2d at 1189.

Also, employees requesting schedule changes for their own

16

convenience cannot demand payment for wait time resulting from this accommodation. *Blum v. Great Lakes Carbon Corp.*, 418 F.2d 283, 287-88 (5th Cir.), *cert. denied*, 90 S.Ct. 1361 (1969) (citing *Jackson v. Air Reduction Co.*, 402 F.2d 521, 523 (6th Cir. 1968)) (waiting in employee's interest noncompensable). After work wait time may be compensable. *See* D.O.L. Opinion Letter WH-533 (Dec. 16, 1991) (wait "purely incidental to postliminary transportation" home is not compensable, wait for instructions or while other workers finish for group transportation home is compensable).

Gasper urges that none of the wait time is compensable because no work of consequence was performed during the wait period. He argues that the workday began when the workers began picking chiles and ended when the chile picking ended.

The workers argue that the morning wait time is compensable as being more than an incident of transportation, and that they were "on duty" during this period. *See Fields*, 108 Lab. Cas. (CCH) ¶ 35,072, at 45,666. The workers argue that the afternoon time waiting to get paid was compensable because the wait served Gasper, not the workers. They contend that Gasper devised his own daily pay system as opposed to a weekly or get-paid-the-next-day system, that Gasper did not have to wait until the end of the day to cash a check from the farmer, and that he did not have to pay his employees daily or pay them in cash. They assert that Gasper's failure to keep required business records delayed payment, and that the system Gasper chose to use was impractical, created burdensome delays, and served Gasper. The workers could not use the waiting time for their own purposes because the fields were isolated and

17

they lacked transportation. *See* D.O.L. Opinion Letter WH-533 (Dec. 16, 1991). Because of Gasper's asserted inefficiencies, the employees argue that the afternoon waiting was performed at "the employer's behest" and should be compensable. *See Dunlop*, 527 F.2d at 401; *Sedano*, 124 Lab. Cas. (CCH) ¶ 35,756.

The district court did not articulate why the wait time should be compensable as a principal activity because it viewed all time as compensable after travel began. We conclude that if the wait time in the morning was the result of the workers' request for a schedule changeSQto have the bus pick them up earlier to avoid the dangers of nights in El PasoSQthen the morning wait time is not compensable as it benefits the workers, not Gasper.[7] On the other hand, if the workers were on duty in the morning so as to get an early start for their employer's benefit (*e.g.*, to assure that work would start promptly at sunrise) or because of Gasper's scheduling, the morning wait time is a compensable principal activity. *See Fields*, 108 Lab. Cas. (CCH) ¶ 35,072, at 45,666. That no work was done during the wait is not necessarily controlling here. Because the district court did not express findings about the purpose of the morning wait, we cannot decide whether the time is compensable. We therefore remand for additional findings concerning the purpose

---

[7]     Although Gasper arranged for the bus to arrive in El Paso two hours early to accommodate the workers, it is unclear whether the bus *departed* El Paso any earlier. Findings on this issue should be made on remand. If the bus left El Paso at the same time as before the schedule change and arrived in the fields at the same time, then it is probable that the morning wait at the fields was predominately for the benefit of Gasper. There is no doubt that any wait time on the bus prior to departing El Paso served the workers and not Gasper because of this scheduling change.

of the morning wait. *See Halferty v. Pulse Drug Co.*, 821 F.2d 261, 269-271 (5th Cir. 1987) (remand for findings concerning purpose of wait time).

We also remand for findings concerning the purpose of the afternoon wait period, whether the wait served Gasper as a result of his burdensome pay system, and whether the workers could effectively use this time for their own purposes. *See Sedano,* 124 Lab. Cas. (CCH) ¶ 35,756 ("Time spent waiting for Defendant Jara to complete his payroll records in the afternoon is predominantly for the benefit of the employer. Because of the isolation of the chile fields and the need to wait for their turn to give . . . Jara payroll information and their tokens, workers cannot use this time effectively for their own benefit.").[8] For example, if the afternoon wait resulted from Gasper's decision to have his employees wait while he cashed the farmer's check, then the wait benefits Gasper and is compensable. Gasper owes wages to his employees whether or not the farmer pays Gasper. If, on the other hand, Gasper's pay system is reasonably efficient, but the wait results from the number of employees involved, then the wait is not compensable. In light of the conflicting testimony in the record, this issue should be resolved by the district court on remand. *See* D.O.L. Opinion Letter WH-533 (Dec. 16, 1991). The *Sedano* case

---

[8] That no work was done during or after the afternoon wait does not of itself determine whether this time is compensable. We recognize that the Portal-to-Portal Act legislative history indicates that waiting in line to receive paychecks is ordinarily not compensable, but we believe that this statement did not necessarily speak to a wait of the present nature under these circumstances. S. Rep. No. 48, 80th Cong., 1st Sess. p. 47 (1947).

provides an example of the type of fact findings needed to support an FLSA claim respecting wait time.

Finally, Gasper argues that no compensation is owed because there was an implied agreement of nonpayment. Implied agreements of noncompensability may be found where employees continue to work after they are on notice of an employer policy of noncompensation. *Rousseau v. Teledyne Movibile Offshore, Inc.*, 805 F.2d 1245, 1248 (5th Cir. 1986), *reh'g denied,* 812 F.2d 971, *and cert. denied*, 108 S.Ct. 95 (1987). We reject Gasper's contention. The workers here were hired and rehired each day and no continuing agreement was shown. The district court's failure to find such an agreement was not clearly erroneous.

III. Liquidated Damages

Gasper claims that liquidated damages were improperly awarded to the workers because he did not violate the FLSA and because he acted in good faith. He does not challenge the liquidated damages for the underpayment of minimum wages for the time spent picking the crops; and, in any event, we discern no error in that respect.

Under 29 U.S.C. § 216(b) (1988) employers who violate the FLSA's minimum wage provisions "shall be liable to the . . . employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages." A judge may reduce the amount of liquidated damages only "if the *employer* shows . . . that the act or omission giving rise to such action was in good faith *and* that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260 (emphasis added); *Mireles v. Frio Foods,*

20

*Inc*, 899 F.2d at 1415. The employer has the *substantial burden* of proving its good faith. *Id.* The district court's findings should only be reversed if they are clearly erroneous. *Id.*

The district court held Gasper liable for the maximum allowable amount of liquidated damages. The court did not explain why Gasper failed to prove that he acted in good faith in not paying the minimum wage for travel and wait time. Clearly no liquidated damages may be awarded respecting the travel time, as it is not compensable. If the district court on remand finds that some or all of the wait time is compensable, the court should make additional findings on whether Gasper proved that he acted in good faith in failing to pay his employees for that time.[9]

IV. Damages Under AWPA

The district court held that its damage award compensated the nine plaintiffs for Gasper's FLSA violations and his AWPA violations of failing to keep proper business records. The court computed the damage award to these nine plaintiffs as if only the

---

[9] Gasper argues that his good faith was demonstrated by the fact that he openly refused to pay his workers for their travel and wait time and because local industry custom regarded travel and wait time as noncompensable. Gasper's open refusal to pay is, standing alone, of at best limited relevance to whether his compensation scheme was grounded in a good faith attempt to comply with the FLSA. Good faith involves showing that Gasper thought he was paying his workers in compliance with the FLSA's minimum wage rule. Gasper's reliance on industry custom as proof of good faith is of greater relevance, but is not necessarily controlling under this record. In *Kimball v. Goodyear Tire & Rubber Co.*, 504 F.Supp. 544, 549 (E.D. Tex. 1980), the court said that acting on advice of counsel who explored industry custom showed good faith. Here, at most, Gasper stated that he attended Department of Labor information meetings for farm labor contractors.

FLSA had been violated.[10] Gasper did not keep the records required of farm labor contractors under the AWPA. 29 U.S.C. § 1831. The Department of Labor also fined Gasper in 1981 for inadequate business records. Had the nine plaintiffs been awarded less relief under the FLSA, the district court may have awarded them more under the AWPA. If that be the case, then, since these plaintiffs' damages under the FLSA will be reduced because their travel time is not compensable, and may be further reduced if some or all of their wait time is not compensable, the district court may want to allow these nine plaintiffs a damage award for Gasper's violations of the AWPA.[11] Accordingly, we authorize the district court to reconsider its zero AWPA award to these nine plaintiffs (but not its AWPA award to the other class members), if and to the extent the district court determines that a larger AWPA award would properly have been made had these nine plaintiffs achieved an FLSA award of the size ultimately determined on remand. The total judgment on remand, however, may not exceed that previously

_____

[10] In computing damages, the district court said, "the nine [named] plaintiffs awarded unpaid wages are adequately compensated [by the FLSA award] for both violations of the FLSA and the AWPA." The other plaintiffs who were not compensated for violations of the FLSA were each awarded $50 of damages under the AWPA. This method of computing damages is permissible, as compensation for violation of one of these statutes may serve to compensate plaintiffs for violations of the other. *Belitz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1333 (5th Cir. 1985).

[11] In class actions such as this, maximum damages for intentional violations of section 1831 are $500 per plaintiff up to a total of $500,000. 29 U.S.C. § 1854(c) (1988). *See Saintida v. Tyre*, 783 F.Supp. 1368, 1375 (S.D. Fla. 1992) ($300 per plaintiff for section 1831 violation); *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217 (7th Cir. 1981) ($100 each for 300 plaintiffs under section 1831).

22

imposed.

## Conclusion

The district court's award of actual and liquidated damages for travel time is reversed, and judgment on such claims shall be rendered for Gasper.  The award respecting time actually spent working and for liquidated damages in respect thereto is affirmed. The balance of the award is vacated, and the cause is remanded for further findings concerning the compensability of the morning and afternoon wait times, findings concerning Gasper's good faith in respect to any such wait time found compensable, and for recomputation of the ultimate award in light of such findings, this opinion, and the AWPA.

AFFIRMED in part; REVERSED in part; VACATED in part; and REMANDED