616 So.2d 163 (1993)
FIRST CAPITAL INCOME AND GROWTH FUNDS, LTD.  SERIES XII, and First Capital Properties Corp., Appellants,
v.
Stanley J. BAUMANN, et al., Appellees.
No. 92-601.
District Court of Appeal of Florida, Third District.
March 30, 1993.
Adorno & Zeder, Jon W. Zeder, John L. Chalif and Raoul G. Cantero, III, Coconut Grove, for appellants.
Fowler, White, Burnett, Hurley, Banick & Strickroot, Richard S. Banick, Steven E. Stark and Michael N. Kreitzer, Miami, for appellees.
Before BARKDULL, JORGENSON and GODERICH, JJ.
PER CURIAM.
The defendants, First Capital Income and Growth Fund, Ltd.  Series XII and First Capital Properties Corporation [hereinafter collectively referred to as "purchaser"], appeal from a final judgment entered in favor of the plaintiffs [hereinafter collectively referred to as "seller"] and from an order denying their motion for judgment in accordance with motion for directed verdict. We affirm.
This case involves a contract dispute between two parties to a real estate contract for the purchase of a shopping center. The agreement provides that it is governed by Illinois law. Under the original language of paragraph 6 of the agreement, the purchase price consisted of the sum of (A) $35 million, (B) an additional amount, if any, to be paid at the closing, which resulted if the Net Operating Income as of the date of closing exceeded $2,975,000 (8 1/2% of $35 million); and (C) the additional purchase price, if any, which the seller could earn by leasing "earnout space" during an "earnout period" commencing on the closing date and ending up to two years thereafter. The parties signed a First Amendment to the agreement agreeing to close on March 1, 1989. The parties entered into a Fourth Amendment to the purchase agreement which increased all elements of the purchase price. The parties signed a Fifth Amendment to the purchase agreement which accelerated the closing to January 30, 1989, and, according to the purchaser, extended beyond the closing date and beyond the date of later proration,[1] the conditions *164 upon purchaser's obligations to pay additional purchase price that were spelled out in paragraphs 10(a)(ii) and (iv).[2]
The parties entered into the Sixth Amendment to the purchase agreement which again recalculated the purchase price. Under this amendment, no additional purchase price would be payable unless the total net operating income exceeded $3,105,772.50 (8 1/2% of $36,538,500). The total net operating income was to be calculated by adding together the net operating income, consisting of the net income from the shopping center derived from the original tenants in possession and paying rent as of March 1, 1989 (the original closing date) and the net rental income, consisting of the net income derived from additional tenants who came into possession during the earnout period of up to two years after March 1, 1989. The purchaser was to determine "in good faith" whether or not any additional purchase price was payable to the seller. Paragraph 6(C)(ii)(C) provided that if all the conditions set forth in Paragraphs 10(c)(ii), (v), (vi) and (vii) are fulfilled, the purchaser shall authorize Escrowee to disburse $500,000 as extra-cost payment.
In April, 1990, the seller filed a complaint against the purchaser seeking monies due to the seller under the agreement. In August, 1990, Zayre, then operating as Ames, permanently closed its store. The purchaser filed an affirmative defense alleging that an anchor tenant, Zayre, had vacated the shopping center in August, 1990, after the case had been filed and that therefore the purchaser had no obligation to pay an additional purchase price.
The purchaser moved for a partial summary judgment on all the seller's claims for additional purchase price. The purchaser argued that the express contract condition on the purchaser's obligation to pay any additional purchase price was not met where the seller's witnesses had admitted that Zayre was not in possession and paying rent pursuant to its lease after August, 1990, when its successor, Ames, went out of business and vacated the shopping center. The trial court denied the motion for partial summary judgment.
The trial court denied the purchaser's motion for directed verdict. The jury's verdict awarded the seller $1,500,000 as additional purchase price and $305,882 based on the finding that the purchaser had exercised bad faith under paragraph 6 of the agreement in connection with one of the prospective tenants, Sweet Stuff. The verdict also awarded the purchaser $250,000 on its counterclaim for taxes and other adjustments. The trial court entered a final judgment awarding the seller $1,794,977 as additional purchase price and denied the purchaser's motion for judgment in accordance with motion for directed verdict.
*165 The purchaser contends that the trial court should have enforced the agreement as written and should have never submitted the case to the jury where the contract provision were unambiguous. We disagree.
The only issue about which the purchaser complains is whether the single phrase "or thereafter" contained in the fifth amendment completely precluded any recovery by the seller, as a matter of law. According to the purchaser, the parties had agreed that the seller would assume the risk of any failure of a covenant, warranty, and/or condition, as well as the tenancy of Ames, for an undefined period of time referred to under the agreement as "thereafter." Thus, according to the purchaser, it was not obligated to pay to the seller any monies under the agreement if "on the date of later proration or thereafter" the condition of paragraph 10(c)(i) through 10(c)(iv) were not fulfilled or waived.
However, the disputed term "thereafter" is not defined anywhere in the agreement. In fact, as the seller points out, the purchaser's interpretation of the term contradicts other important provisions of the agreement. For example, paragraph 6(C)(ii)(B) provides that the seller is entitled to the payment of monies under the agreement upon the occurrence of the date of later proration. Similarly, paragraph 6(C)(iii)(II) of the agreement also requires that the purchaser pay any monies due under the agreement as of the date of later proration.
As stated by the Illinois Supreme Court:
A contract will be considered ambiguous if it is capable of being understood in more sense than one. Where a court determines that a contract is ambiguous, its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended.
Farm Credit Bank of St. Louis v. Whitlock, 144 Ill.2d 440, 163 Ill.Dec. 510, 513, 581 N.E.2d 664, 667 (Ill. 1991) (citation omitted). Moreover,
A contract should be construed as a whole to give effect to the intention of the parties, and great weight should be given to the principal apparent purpose and intention of the parties at the time of contracting... . [Where] the construction to be placed in the agreement is dependent not only upon the meaning of the words employed, but also upon extrinsic facts and circumstances, and upon the construction which the parties themselves have placed upon the agreement, as these facts are controverted, any inferences to be drawn are for the trier of fact.
Vole, Inc. v. Georgacopoulos, 181 Ill. App.3d 1012, 131 Ill.Dec. 17, 23, 538 N.E.2d 205, 211 (Ill. App.Ct. 1989) (citations omitted).
We find that the term "thereafter" rendered the contract provision uncertain of meaning. Since the agreement was susceptible to different interpretations, the trial court properly allowed the parties to present parol evidence. Moreover, the trial court properly submitted the seller's claim for breach of contract to the jury where the terms of the agreement were ambiguous and the evidence at trial raised genuine issues of material fact. Finally, we will not set aside the jury's findings of fact where these findings were supported by competent substantial evidence. Vole, 131 Ill.Dec. at 17, 538 N.E.2d at 205; Laufer v. Norma Fashions, Inc., 418 So.2d 437, 439 (Fla. 3d DCA 1982).
Affirmed.
NOTES
[1] In order to satisfy the seller's construction loan, the parties agreed to close on January 30, 1989, at which time title would pass to the purchaser in exchange for the payment of a preliminary purchase price. The "later proration" was the time at which all prorations, adjustments and credits (not recognized at the initial closing) would be paid. Paragraph 6(C)(ii)(B) defines the date of later proration as that date between March 1, 1989, and August 31, 1990, which is three business days after the purchaser has confirmed that all conditions set forth in paragraph 10(c) have been satisfied.
[2] Paragraph 10 entitled "Conditions to Purchaser's Obligation to Close" provides, in pertinent part, as follows:

(a) Provided Purchaser has met each and every one of its obligations hereunder, Purchaser shall not be obligated to proceed with the closing unless and until each of the following conditions has been either fulfilled or waived in writing by Purchaser: * * *
(ii) There shall have been no uncured breach of any representation, warranty, or covenant given by Seller herein; * * *
(iv) Each of the Anchor Tenants, as hereinafter defined, shall be in possession of and paying rent, pursuant to their respective Leases, and such premises shall be fully completed in accordance with the terms and provisions of such respective Leases.
In the Fifth Amendment the parties added Paragraph 10(c), which states, in pertinent part:
(c) Notwithstanding anything to the contrary contained herein (including, without limitation, Paragraph 6), Purchaser shall not be obligated on the date of Later Proration or thereafter to pay to, or credit Seller with, any sums required to be credited to Seller under this Agreement, including, without limitation, the NOI Amount, or any part thereof, or any Additional Purchase Price, unless and until each of the following condition has been either fulfilled or waived in writing by Purchaser:
* * * * * *
(ii) Each of the conditions set forth in Paragraph 10(a)(ii) and Paragraph 10(a)(iv) remains fulfilled.