[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 11, 2002
THOMAS K. KAHN
CLERK

_____

No. 01-16402

_____

D. C. Docket No. 99-01760-CV-T-30

JORGE E. ARRIAGA,
ROSALIO HARO-SANCHEZ,
MOISES OCHOA-ROSALES,
RAYMUNDO VASQUEZ,
LUCIO BARTOLO-HUERTA,
OSCAR BRAVO-MOYA,
INOCENIO GERONIMO-MAGANA,
ADOLFO GREGORIO,
SANTIAGO JARAMILLA-GOMEZ,
ALFONSO LUNA-MARTINEZ,
JORGE NIETO-JASSO,
DANIEL MOLINA-GREGORIO,
GILBERTO PEREZ-FLORES,
JOSE LUIS SOLIS-CAMACHO,
JUAN FRANCISCO BALDERAS-SEPULVEDA,
FRANCISCO SEPULVEDA,

                                        Plaintiffs-Appellants

                    versus

FLORIDA PACIFIC FARMS, L.L.C.,
SLEEPY CREEK FARMS, INC.,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Middle District of Florida
_____

**(September 11, 2002)**

Before DUBINA, BARKETT and KRAVITCH, Circuit Judges.

KRAVITCH, Circuit Judge:

The plaintiffs-appellants are migrant farm workers from Mexico (the "Farmworkers") employed by the defendants-appellees Florida Pacific Farms, L.L.C. and Sleepy Creek Farms, Inc. (the "Growers") during the 1998-1999 strawberry and raspberry seasons. The Farmworkers sued the Growers, alleging a failure by the Growers to comply with the minimum wage provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 203(m) & 206(a), and the terms of the work contracts. Specifically, the FLSA claim asserted that the Growers' failure to reimburse the Farmworkers' travel, visa, and recruitment costs at the end of the first workweek pushed their first week's wages below the minimum wage. The contract claim contended that the Growers violated the work contract by not reimbursing the Farmworkers for the cost of transportation to and from their home villages to the Mexican point of hire.

The parties filed cross motions for summary judgment, which were based

2

upon an agreed statement of undisputed facts. The district court granted the Growers' motion and denied the Farmworkers' motion. The court concluded that the Growers were not obligated under the FLSA to reimburse transportation and visa costs because such expenses were not primarily for the benefit of the employer as defined by the FLSA and Department of Labor ("DOL") regulations. Because the Growers had not authorized the referral fees and lacked awareness or control of that practice, the court held that they should not be responsible for reimbursing the fees. As for the contract claim, the court held that the Growers did not breach the contract with the Farmworkers because it found that the agreement clearly and unambiguously intended to reference Monterrey, Mexico, and not the home villages of the Farmworkers, as the point from which the Growers would provide transportation costs.

Because the district court misinterpreted the DOL regulations, we hold that it erred in determining that the Growers are not obligated to reimburse the Farmworkers for their transportation, visa, and immigration expenses. The court correctly held that the Growers are not responsible for the recruitment fees. As to the breach of contract claim, the court erred in holding that the contract provision unambiguously provided for transportation from Monterrey to be paid by the Growers; under Florida contract law, the Farmworkers were entitled to

3

transportation costs incurred from their home villages.

# I. BACKGROUND

*A. H-2A Program Overview*

As part of the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.

L. No. 99-603, 100 Stat. 3359 (codified as amended in scattered sections of 8

U.S.C.), the H-2A program was established. See U.S.C. § 1188. Under the

program a category of nonimmigrant foreign workers can be used for temporary

agricultural employment within the United States. See id. Agricultural employers

are permitted to hire nonimmigrant aliens as workers under the H-2A program if

they first obtain from DOL certification that (1) there are insufficient domestic

workers who are willing, able, and qualified to perform the work at the time and

place needed;[1] and (2) the employment of aliens will not adversely affect the wages

and working conditions of domestic workers. See id. §§ 1184(c)(1), 1188(a)(1).

The conditions under which an H-2A worker may be allowed into the United

States for temporary agricultural employment are prescribed by the H-2A

---

[1] In addition to searching for domestic workers before gaining DOL certification, agricultural employers must hire any qualified domestic worker who seeks employment, under the terms of the work contract, during the first fifty percent of the work contract period. See 8 U.S.C. § 1188(c)(3)(B)(i). An H-2A worker may be displaced in this situation, and the agricultural employer is then relieved from its obligations to that worker under the work contract. See id. § 1188(c)(3)(B)(vi).

regulations.  See generally 20 C.F.R. Part 655, Subpart B.[2]  The H-2A regulations

include provisions related to housing, meals, work-related equipment, and

transportation.  For example, an employer seeking the services of H-2A workers

must compensate them at a rate not less than the federal minimum wage, the

prevailing wage rate in the area, or the "adverse effect wage rate," whichever is

highest.  See 20 C.F.R. § 655.102(b)(9).  The "adverse wage rate" is the minimum

wage rate that DOL determines is necessary to ensure that wages of similarly

situated domestic workers will not be adversely affected by the employment of H-

2A workers.  See id. §§ 655.100(b), 655.107.  An employer must also pay an H-2A

worker for inbound transportation and subsistence costs, if the worker completes

50 percent of the contract work period, unless the employer has previously done

so.  See id. § 655.102(b)(5)(i).[3]  Similarly, if the worker completes the contract

---

[2] The H-2A visa, which permits the nonimmigrant foreign agricultural worker to be in the United States, is also governed by regulations issued by the Immigration and Naturalization Service.  See 8 C.F.R. § 214.2(h).  The H-2A worker is only admitted into the United States to work for the designated employer and for the duration of the certified period of employment, which cannot exceed one year.  If the employment relationship ends–whether the employee quits or the employer terminates the employment–the H-2A visa expires, and the worker must leave the United States.  See id. §§ 214.2(h)(5)(viii), (h)(11)(iii)(A)(1), & (h)(13).

[3]

> If the employer has not previously advanced such transportation and subsistence costs to the worker or otherwise provided such transportation or subsistence directly to the worker by other means and if the worker completes 50 percent of the work contract period, the employer shall pay the worker for costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer to the place of employment.

20 C.F.R. § 102(b)(5)(i).

work period, the employer is generally responsible for the payment of outbound transportation and subsistence costs. See id. § 655.102(b)(5)(ii).[4]

## B. Facts

The parties agreed to a statement of undisputed facts. The Growers applied for and obtained approval from DOL for admission of alien workers under H-2A status to be employed during the 1998-99 strawberry and raspberry seasons. The applications[5] were completed by the Florida Fruit and Vegetable Association ("FFVA") on behalf of the Growers. Both of the clearance orders submitted by the Growers offered transportation arrangements in compliance with the requirements of 20 C.F.R. § 655.102(b)(5), including an offer that a worker who completed the first 50 percent of the contract period was entitled to reimbursement for the costs of his transportation to the jobsite "from the place from which the worker has come to work for the employer." For workers who completed the contract period, the clearance orders offered to provide return transportation using similar language.

In its efforts to locate Mexican workers willing to accept the approved H-2A

---

[4] The rules are different when the H-2A worker has contracted for employment with a subsequent employer. See 20 C.F.R. § 655.102(b)(5)(ii).

[5] The applications, which request temporary alien agricultural certification from DOL, are called "clearance orders." 20 C.F.R. 653.501. On a clearance order, an employer certifies that "[t]his job order describes the actual terms and conditions of the employment being offered by me, and contains all the material terms and conditions of the job." See id. § 653.501(d)(3). Therefore, the clearance orders ultimately become the work contract between the employers and farmworkers.

visas and to arrange for their transportation to Florida, the Growers used the services of FFVA, which utilized Florida East Coast Travel Service Inc. ("Florida East Coast Travel") and Berthina Cervantes. Cervantes maintained an office in Monterrey, Mexico, and assembled the group of workers through several means. Some workers already in Monterrey learned that Cervantes was searching for agricultural workers to go to the United States. Cervantes also called contact persons or responded to calls from persons in other parts of Mexico who sought agricultural work in the United States for themselves or others in their communities. The Growers at times provided Cervantes with the names of contact persons in other parts of Mexico and specific individuals who should be contacted for jobs.

When communicating with contact persons, Cervantes gave general information related to the employment. She explained that interested workers would be contacted again to identify when they were to report to Monterrey. Cervantes indicated that the workers would need $130 for transportation from Monterrey to Florida, $45 for the visa application, and $100 for the visa. The contact persons then passed this information on to interested workers. Some of these contact persons charged the workers a referral fee which varied in amount. The Growers, FFVA, Florida East Coast Travel, and Cervantes had no knowledge

that referral fees were being requested or paid, and none of them made any payments to the contact persons.

Florida East Coast Travel arranged for buses to transport workers from Laredo, Texas, to the job sites in Florida for $110 per worker. After Florida East Coast Travel informed Cervantes of the date of departure from Laredo, she called the contact persons to inform them when the workers should report to Monterrey. The contacted workers who were not from Monterrey paid their own transportation and subsistence from their home villages to Monterrey.

Cervantes required workers who had not previously been hired by her or the Growers to be interviewed in Monterrey. At the interview she or one of her employees determined if the applicant had prior agricultural experience and was capable of doing the work. The workers who passed the interview, along with those who did not require an interview, then filled out visa applications and paid Cervantes the following amounts: $100 for the visa; $45 for the visa application fee; and $130 for transportation ($20 bus fare from Monterrey to Laredo, Texas, and $110 bus fare from Laredo to Florida). Some workers also were required to pay a recruitment fee to Cervantes's assistant, Maria Del Carmen Gonzalez-Rodriguez. This occurred without the knowledge of Cervantes, Florida East Coast Travel, FFVA, or the Growers; this fee was contrary to directions given by Florida

8

East Coast Travel, FFVA, and the Growers, who were paying Cervantes $50 per worker for her services and who had directed her not to charge the workers a fee. The workers also were required to pay $6 to the U.S. Immigration Service at the border for the issuance of their entry document.

At the conclusion of the 50 percent period of the contract, the Growers reimbursed workers still on the job $130 for transportation from Monterrey to Florida. When the contract period ended, the Growers provided the workers with a bus ticket to Laredo, Texas, and $20 to be used toward a bus ticket to Monterrey, or any destination in Mexico. The Growers did not pay any of the workers the costs for transportation from their homes to Monterrey, visa costs, the entry document fee, or any payments made to local contact persons or Gonzalez-Rodriguez.

## II. DISCUSSION

We review a district court's grant of summary judgment de novo, "viewing the evidence in the light most favorable to the party opposing the motion." Coppage v. U.S. Postal Serv., 281 F.3d 1200, 1203 (11th Cir. 2002). Here, the parties agreed to a statement of undisputed facts, set forth above.

*A.     FLSA Claim*

The protections of the minimum wage provisions of the FLSA indisputably apply to the Farmworkers.  See 20 C.F.R. § 655.103(b) ("During the period for which the temporary alien agricultural labor certification is granted, the employer shall comply with applicable federal, State, and local employment-related laws and regulations . . .").  Employers must provide workers' weekly wages "in cash or in facilities", "free and clear" of improper deductions, at a rate no lower than the minimum wage rate ($5.15 per hour since 1997).  29 U.S.C. § 206(a)(1); 29 C.F.R. §§ 531.35, 776.4.  The only statutory exception to this requirement is set forth in 29 U.S.C. § 203(m), which allows an employer to count as wages the reasonable cost "of furnishing [an] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."

According to the Growers, the FLSA analysis should be guided by the H-2A regulations.  For example, H-2A regulations require that when a worker completes 50% of the contract period, the employer must compensate the worker for the inbound transportation costs if not previously provided.  See 20 C.F.R. §§ 655.102(b)(5)(i), 655.202(b)(5)(i).  The regulations governing the H-2A program, however, state that the "employer shall comply with applicable federal, State, and

10

local employment related laws and regulations[.]" Id. § 655.103(b).[6] Furthermore,

the Supreme Court has stated that when employment statutes overlap, we are to

apply the higher requirement unless the regulations are mutually exclusive. See

Powell v. U.S. Cartridge Co., 339 U.S. 497, 519 (1950).[7] There has been no

demonstration here that it is impossible to simultaneously comply with both sets of

regulations. If the FLSA mandates that employers reimburse certain expenses at an

earlier time than the H-2A regulations, requiring employers to do so would satisfy

---

[6] The Growers agreed to comply with 20 C.F.R. §§ 655.103 and 653.501 in their clearance orders. See Florida Pacific Farms Clearance Order at 5, Sleepy Farms Clearance Order at 5. In the letters from DOL accepting the contract orders, the regional administrator informed the Growers that:

> The employer's obligation to pay the full FLSA minimum wage for all pay periods is not overridden by the H-2A program's regulation at 20 CFR 655.102(b)(5)(i), under which the employer is required to reimburse the worker's inbound travel expenses once the worker has completed 50% of the work contract period originally offered.

Letter from Toussaint L. Hayes, Department of Labor Regional Administrator, to Walter Kates, Director of Labor Relations, Florida Fruit & Vegetable Association 4 (August 19, 1998) (letter accepting Florida Pacific Farms Clearance Orders); Letter from Toussaint L. Hayes, Department of Labor Regional Administrator, to Walter Kates, Director of Labor Relations, Florida Fruit & Vegetable Association 4 (August 19, 1998) (letter accepting Sleepy Creek Farms Clearance Orders).

[7] In this case involving the FLSA and the Walsh-Healey Act, 41 U.S.C. § 35, et seq., the Supreme Court stated:

> There has been no presentation of instances, however, where compliance with one Act makes it impossible to comply with the other. There has been no demonstration of the impossibility of determining, in each instance, the respective wage requirements under each Act and then applying the higher requirement as satisfying both.

Powell v. U.S. Cartridge Co., 339 U.S. 497, 519 (1950).

both statutes.[8]

The Growers contend that the FLSA was satisfied because the Farmworkers' hourly wage rate was higher than the FLSA minimum wage rate and deductions were not made for the costs the Farmworkers seek to recover. The district court correctly stated that there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which they could not deduct, for the employee to bear. An employer may not deduct from employee wages the cost of facilities which primarily benefit the employer if such deductions drive wages below the minimum wage. See 29 C.F.R. § 531.36(b). This rule cannot be avoided by simply requiring employees to make such purchases on their own, either in advance of or during the employment. See id. § 531.35; Ayres v. 127 Rest. Corp., 12 F. Supp.2d 305, 310 (S.D.N.Y. 1998).[9]

---

[8] The Growers contend that this could result in the reimbursement of inbound transportation costs to a worker who works only one day. The district court found this persuasive. Stating that the FLSA balances the protection of the employee with that of the employer, the court believed that delaying reimbursement until half of the contract has been performed protects employers by guaranteeing that the workers perform under the labor contract. This is not a legal argument but instead a policy-based argument that cannot guide our construction of these statutes, for it runs counter to Powell. The fact that this risk exists is not an excuse for failure to comply with the FLSA; employers must reimburse employees for the cost of uniforms promptly, even though there is some risk that the employees may quit soon thereafter. Cf. Marshall v. Root's Rest., Inc., 667 F.2d 559, 560 (6th Cir. 1982).

[9] The DOL made this view clear to the Growers in the letters accepting the Growers' clearance orders, where it stated that the FLSA "prohibits the employer from taking deductions from a worker's pay or otherwise driving the worker's wages below the FLSA minimum wage by imposing on the worker an expense which is primarily for the benefit of the employer." Letter from Toussaint L. Hayes, Department of Labor Regional Administrator, to Walter Kates,

12

An employer is allowed to count as wages the reasonable cost "of furnishing [an] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m). Although the FLSA does not define "other facilities", DOL has promulgated regulations dedicated to this term which identify circumstances when an employer may claim a wage credit or deduction for the provision of "other facilities." See 29 C.F.R. § 531.32. One of the DOL regulations states that "the cost of furnishing 'facilities' which are primarily for the benefit or convenience of the employer will not be recognized as reasonable and may not therefore be included in computing wages." Id. §531.32(c).

For guidance in applying this test, DOL regulations provide "a list of facilities found by the Administrator to be primarily for the benefit [or] convenience of the employer," which includes tools and uniforms. Id. § 531.3(d)(2). The expenses which are primarily for the benefit of the employee, and therefore constitute other facilities, include: meals; dormitory rooms; housing; merchandise from company stores such as "food, clothing, and household effects";

Director of Labor Relations, Florida Fruit & Vegetable Association 3 (August 19, 1998) (letter accepting Florida Pacific Farms Clearance Orders); Letter from Toussaint L. Hayes, Department of Labor Regional Administrator, to Walter Kates, Director of Labor Relations, Florida Fruit & Vegetable Association 3 (August 19, 1998) (letter accepting Sleepy Creek Farms Clearance Orders).

13

and fuel, electricity, water and gas "furnished for the noncommercial personal use of the employee." Id. § 531.32(a).

If an expense is determined to be primarily for the benefit of the employer, the employer must reimburse the employee during the workweek in which the expense arose. See 29 C.F.R. § 531.35.[10] Situations in which items such as required tools or uniforms were purchased before the first workweek are not explicitly covered by the regulations. However, there is simply no legal difference between an employer requiring a worker to have the tools before the first day of work, requiring the tools to be purchased during the first workweek, or deducting the cost of the tools from the first week's wages. Compliance with the FLSA is measured by the workweek. See id. § 776.4. Workers must be reimbursed during the first workweek for pre-employment expenses which primarily benefit the employer, to the point that wages are at least equivalent to the minimum wage.[11]

_____

[10]

For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid under the Act.
29 C.F.R. § 531.35.

[11] An example may clarify confusion in this terminology. Suppose a worker is required to bring to work tools which cost $100. In his first workweek, he works 40 hours at a rate of $7 per hour. If only given pay for the hours worked, which would be $280, the FLSA would be violated. This is so because the cost of the tools, which has been imposed on the worker prior to employment, reduces the wages to $180; when $180 is divided by 40 hours, the hourly rate drops below the minimum wage of $5.15. However, the FLSA does not require the employer to add

14

Cf. Marshall v. Root's Rest., 667 F.2d 559, 560 (6th Cir. 1982) (affirming district court finding that defendants required waitresses to wear uniforms at work and that the cost of uniforms therefore pushed first week pay below minimum wage).

The costs in dispute are de facto deductions which, if not permissible, drove the Farmworkers' pay below the FLSA minimum wage. We thus must analyze whether the transportation, visa, and recruitment costs incurred by the Farmworkers are primarily for the benefit or convenience of the employer. If so, the Growers must reimburse the Farmworkers up to the point that their wages satisfy the FLSA minimum wage.

1. Transportation costs

The Farmworkers paid $130 for bus transportation from Monterrey, Mexico, to the farms in Florida. To determine whether or not this cost is "primarily for the benefit or convenience of the employer," we begin with the DOL regulations, §§ 531.3 and 531.32. Transportation costs are twice mentioned, and in each situation the regulation states that where such transportation is "an incident of and necessary to the employment," it does not constitute "other facilities." 29 C.F.R. § 531.32(a) & (c). The Farmworkers contend that opinion letters issued by the Department of

---

the cost of the tools onto the regular wages, but only to reimburse the worker up to the point that the minimum wage is met. To satisfy the FLSA, the employer would need to pay this worker $306 the first workweek: $100 for the tools plus $206 (40 hours multiplied by $5.15).

Labor specifically address whether transportation costs associated with migrant or H-2A workers are "incident of and necessary to the employment," and that these letters deserve deference. Both parties contend that caselaw supports their position. However, we find neither the opinion letters nor the caselaw cited to be helpful in resolving this issue. We first turn to the DOL opinion letters.

### a. DOL Opinion Letters

In its decision on the motions for summary judgment, the district court did not consider the DOL opinion letters; in fact, it stated that under Federal Rule of Civil Procedure 56, it could not consider the letters as part of the summary judgment decision. In failing to consider the opinion letters, the court erred. The Supreme Court has held in Skidmore v. Swift that the "rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. 134, 140 (1944). That the opinion letters should be considered, however, does not render them dispositive. We turn to a consideration of these letters and the amount of deference they are due.

Although a DOL opinion letter is created through means less formal than "notice and comment" rulemaking, it is not "automatically deprive[d] . . .of the

16

judicial deference otherwise its due." Barnhart v. Walton, 122 S. Ct. 1265, 1271 (2002). Agency interpretations expressed in opinion letters must be viewed through the standard enunciated in Skidmore, 323 U.S. at 140. See Christensen v. Harris County, 529 U.S. 576, 587 (2000) (reaffirming the applicability of Skidmore to opinion letters). The Skidmore Court held that when considering the deference to "rulings, interpretations and opinions of the Administrator," the "weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." Skidmore, 323 U.S. at 140; see also Christensen, 529 U.S. at 587 ("[I]nterpretations contained in formats such as opinion letters are entitled to respect under our decision in [Skidmore], but only to the extent that those interpretations have the power to persuade . . . ." (quotations and citations omitted)).

Opinion Letters Nos. 937 and 1139 support the Farmworkers' position that the transportation costs at issue here are an incident of and necessary to the employment, for they characterize such travel costs "as a cost incidental to the employer's recruitment program." U.S. Dept. of Labor, Op. Ltr. of the Wage-Hour Adm'r No. 1139 (WH-92) (Dec. 10, 1970); U.S. Dept. of Labor, Op. Ltr. of

17

the Wage-Hour Adm'r No. 937 (Feb. 4, 1969) (travel costs are a cost "incidental to the recruitment program of the contractor"). The Growers contend, however, that because the letters are conclusory, they are not entitled to any deference or respect under Skidmore.[12]

In its first opinion letter on this issue, the Wage-Hour Administrator refers to a previous situation where it found that transportation costs were to be borne by the employer "as a cost incidental to the recruitment program." Op. Ltr. No. 937. The letter, however, does not offer any reasoning for this conclusion. Later opinion letters simply state that transportation costs to and from the point of hire have been "consistently regarded" as a cost to be borne by the employer. Op. Ltr. No. 1139. The most recent Opinion Letter simply offers, in a conclusory fashion, that transportation costs are "deemed to be primarily for the benefit of the employer." U.S. Dept. of Labor, Op. Ltr. of the Wage-Hour Adm'r No. 1721 (June 27, 1990). Because of this lack of explanation, it is impossible to weigh the "validity of its reasoning" or the "thoroughness [ ] in its consideration." Skidmore, 323 U.S. at 140; see also Kilgore v. Outback Steakhouse of Fla., Inc., 160 F.3d 294, 302-03

---

[12]The Growers also claim that recent correspondence of DOL casts doubt on the validity of the prior opinion letters; however, this correspondence is not part of the record in this case. It was not presented to the district court and is not part of the public record. Therefore, consideration would be inconsistent with 11th Circuit Rule 30-1 ("Appeals from the district courts . . . shall be on the original record . . .").

(6th Cir. 1998) (finding that the Wage & Hour Administrator's opinion letters relied on "do not have any persuasive value" because the "opinion letters provide no reasoning or statutory analysis to support their conclusion").  Although the Administrator's opinion letters since 1969 consistently have taken the position that transportation costs primarily benefit the employer, that position alone is not sufficient; the Farmworkers' position that the transportation costs at issue here should be borne by the employer requires more support than the opinion letters provide.

> b. *Caselaw*

The parties cite no Supreme Court or Eleventh Circuit precedent that provides guidance on the question whether the transportation costs are primarily for the benefit of the employer.  Turning to other courts, the Farmworkers cite to three federal district court opinions, each of which holds that the transportation costs at issue should be borne by the employer.   These cases will be considered in turn.

In Torreblanca v. Naas Foods, Inc., a food processing company deducted the cost of transportation for the plaintiff migrant agricultural workers from their paychecks.  See Torreblanca v. Naas Foods, Inc., No. F 78-163, 1980 WL 2100, at *1 (N.D. Ind. Feb. 25, 1980).  After discussing the test for transportation costs as

19

found in 29 C.F.R. § 531.32–that transportation costs are not "other facilities" where "'such transportation is an incident of and necessary to the employment'"–the court found that for "seasonal migrant workers, transportation is an incident of employment." Torreblanca, 1980 WL 2100, at *5. To support this conclusion, the court apparently relied exclusively on opinion letters of the Wage and Hour Administrator.[13] As discussed above, however, when assessing the deference to give an opinion letter, a court must look to Skidmore in evaluating the agency's position. See Christensen, 529 U.S. at 587. Because it provides no other rationale for its conclusion, Torreblanca is not persuasive.

Marshall v. Glassboro Service Ass'n and Brock v. Glassboro Service Ass'n are opinions arising from the same litigation but at different times. See Marshall v. Glassboro Serv. Ass'n, 1979 WL 1989, *2-*3 (D.N.J. Oct. 19, 1979) (finding that the transportation costs do not constitute other facilities); Brock v. Glassboro Serv. Ass'n, No. 78-0377, 1987 WL 25334, at *5-*6 (D.N.J. July 23, 1987), aff'd sub. nom. McLaughlin v. Glassboro Serv. Ass'n, 841 F.2d 1119 (3d Cir. 1988) (holding that "the cost of transportation from the point of recruitment to the point of hire

---

[13] The court states that "[t]his position has been taken by the Wage and Hour Division of the United States Department of Labor, and this position is reasonable." Torreblanca v. Naas Foods, Inc., No. F 78-163, 1980 WL 2100, at *5 (N.D. Ind. Feb. 25, 1980). The court does not state what represents the position of the Wage and Hour Division, but as it does not cite to the Code of Federal Regulations, it appears that the court is considering opinion letters.

20

(Puerto Rico to New Jersey) was part of the *employer's recruitment cost* and thus could not be considered part of the employee's wage"). The facts and analyses in these cases are quite similar to Torreblanca. Like Torreblanca, neither provides guidance to us in our consideration of the issues here because both totally defer to opinion letters, which is inappropriate under Christensen and Skidmore.

The district court and the Growers primarily rely on Vega v. Trevino, 36 F.3d 417 (5th Cir. 1994), which held that time spent traveling to and from work is not compensable under the "Portal-to-Portal Act", 29 U.S.C. § 251 et seq. The Growers assert that the appropriate standard should be drawn from Vega: only items which are directly connected or integral to the performance of the employee's principal activity are primarily for the benefit and convenience of the employer. In Vega, seasonal farmworkers asserted that the defendant farm labor contractor's failure to compensate them for their time traveling to and from work constituted a violation of the FLSA. 36 F.3d at 423. Under the Portal-to-Portal Act, however, an employer is not liable under the FLSA for certain employee activities. See 29 U.S.C. § 254(a).[14] If the time spent traveling to and from work

---

[14] For the following activities, employers do not have to pay employees the minimum wage:

> (1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

21

daily is a "principal activity" of the employee, the employees would be due FLSA

minimum wages.  See Vega, 36 F.3d at 424; 29 U.S.C. § 254(a).  The court

construed the term "principal activity" to include "activities performed as part of

the regular work of the employees in the ordinary course of business," where the

"work is necessary to the business and is performed by the employees, primarily

for the benefit of the employer[.]"  Vega, 36 F.3d at 424 (internal quotations and

citations omitted).  The district court in this case stated that the Farmworkers'

claim turns on the same language as the Vega plaintiffs–whether the travel

primarily benefits the employer–although it noted that the Farmworkers here are

claiming travel costs whereas the workers in Vega sought wages for travel time.

Basing its decision on Vega, the district court found that the travel expenses

incurred by the Farmworkers were not costs that primarily benefit the employer.

The district court erred in its reliance on Vega for two reasons.[15]  First, the

_____

(2) activities which are preliminary to or postliminary to said principal activity or
activities,

which occur either prior to the time on any particular workday at which such
employee commences, or subsequent to the time on any particular workday at
which he ceases, such principal activity or activities.
29 U.S.C. §254(a).

[15] The district court stated that it "is bound by the opinions of the Courts of Appeal."
Even if the Fifth Circuit opinion was on point, it would not be binding on this court or the district
court.  Just as this court should "respect and carefully weigh the views of other circuits," United
States v. Stone, 9 F.3d 934, 941 (11th Cir. 1993), a district court should do likewise.  However,
only the decisions of the Supreme Court and this court are binding on the district courts of this

22

district court failed to note that in <u>Vega</u>, the type of travel under evaluation was fundamentally different than the nature of the travel here. The workers in <u>Vega</u> spent at least four hours daily traveling to and from work; although this is a long trip, the court found that this "was just an extended home-to-work-and-back commute." <u>Id</u>. at 424-25. According to the court, this time "was indisputably ordinary to-work or from-work travel and not compensable." <u>Id</u>. at 425. Here, by contrast, the Farmworkers' petition for transportation costs derived from a one-time bus ride from Monterrey, Mexico, to Florida. This is not a minor factual distinction, but rather a fundamental difference making <u>Vega</u> inapposite.

Second, <u>Vega</u> involves the Portal-to Portal Act rather than the FLSA. Because the Farmworkers do not seek to be compensated for their *time* spent traveling, the Portal-to-Portal Act does not apply. Although <u>Vega</u> employs the same language as the DOL regulations interpreting the FLSA–"primarily for the benefit of the employer"– the language is being applied to statutes with different concepts and different purposes. Section 531.32 uses this language to determine "other facilities" whereas the <u>Vega</u> test defines "principal activity." The FLSA prevents improper deductions from reducing the wages of a worker below the minimum wage, <u>see</u> 29 C.F.R. § 531.35 (wages must be "free and clear" of

_____

circuit.

23

improper deductions), whereas the Portal-to-Portal Act prevent courts from construing the term "work" too widely. See Reich v. N.Y. City Transit Auth., 45 F.3d 646, 649 (2d Cir. 1995) (stating that the Portal-to-Portal Act "represented an attempt by Congress to delineate certain activities which did not constitute work"). The standard urged by the Growers is inappropriate to import into the FLSA.[16]

### c. Analysis

We return to the actual language of the DOL regulations in our effort to determine whether or not the transportation costs at issue constitute "other facilities." Clearly, § 531.32 considers expenses related to commuting between home and work–like that in Vega–to be primarily for the benefit of the employee and thus they would constitute "other facilities." See 29 C.F.R. § 531.32(a) ("transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act" is

---

[16] It should also be noted that the caselaw is replete with opinions that conflict with the standard asserted by the Growers. In many cases involving the FLSA, courts found that a certain item, which was obviously not directly connected to the performance of the employee's principal activity, was nevertheless primarily for the benefit of the employer. See, eg., Brennan v. Modern Chevrolet Co., 363 F. Supp. 327, 333 (N.D. Tex. 1973), aff'd 491 F.2d 1271 (5th Cir. 1974) (affirming without opinion) (holding that car salesman's use of an automobile was primarily for the benefit of the employer even though 90% of mileage was for personal use); Masters v. Md. Mgmt. Co., 493 F.2d 1329, 1331-34 (4th Cir. 1974) (holding that lodging of a stationary engineer could not be deducted from wages because his residing at the complex was primarily for the benefit of the employer); Bailey v. Pilots' Ass'n for Bay & River Del., 406 F. Supp. 1302, 1309 (E.D. Pa. 1976) (holding that the cost of lodging on the ship is not includable as wages, for sleeping on the vessel was primarily for the benefit and convenience of the employer).

primarily for the benefit or convenience of the employee).  Other transportation

costs, such as the bus fare at issue here or travel from one job site to another, may

or may not be considered "other facilities," depending on whether the travel is "an

incident of and necessary to the employment." 29 C.F.R. § 531.32(a); see also 29

C.F.R. § 531.32(c) ("transportation charges where such transportation is an

incident of and necessary to the employment (as in the case of maintenance-of-way

employees of a railroad)" are "primarily for the benefit or convenience of the

employer").  If the transportation charge falls into this category, it does not

constitute "other facilities" and may not be counted as wages; the employer

therefore would be required to reimburse the expense up to the point the FLSA

minimum wage provisions have been met.[17]

The Growers hired the Farmworkers–nonimmigrant aliens allowed to

perform seasonal or temporary agricultural work–pursuant to the H-2A visa

program.  In choosing to participate in this program, the Growers understood that

---

[17] The Growers assert that the transportation costs borne by the Farmworkers are not primarily for the benefit of the employer because they were incurred prior to the commencement of employment.  Again, the Growers have borrowed a standard from the Portal-to-Portal Act, see 29 U.S.C. § 254(a)(2) (employers do not have to pay minimum wage for time spent on activities which are preliminary to the principal activity), and attempt to impose it onto the FLSA.  Even assuming that the transportation expense occurred prior to the employment relationship, this would not permit the Growers to avoid this expense if it is determined to be primarily for their benefit.  Such a position would permit employers to avoid expenses primarily for their benefit simply by making them a requirement to employment, which would allow an end-run around the FLSA.

25

certain regulations would be imposed on them. Nonimmigrant alien workers employed pursuant to this program are not coming from commutable distances; their employment necessitates that one-time transportation costs be paid by someone. We hold that this transportation cost is "an incident of and necessary to the employment" of H-2A workers. Dictionary definitions of "incident" and "necessary" bear this out. Incident is defined as "dependent on, subordinate to, arising out of, or otherwise connected with" something else. Black's Law Dictionary 765 (7th ed. 1999); see also Black's Law Dictionary 762 (6th ed. 1990) ("Used as a noun, ["incident"] denotes anything which inseparably belongs to, or is connected with, or inherent in, another thing, called the 'principal'."). "Necessary" means "of an inevitable nature: inescapable." Merriam-Webster's Collegiate Dictionary 776 (10 ed. 1995). Transportation charges are an inevitable and inescapable consequence of having foreign H-2A workers employed in the United States; these are costs which arise out of the employment of H-2A workers. When a grower seeks employees and hires from its locale, transportation costs that go beyond basic commuting are not necessarily going to arise from the employment relationship. Employers resort to the H-2A program because they are unable to employ local workers who would not require such transportation costs; transportation will be needed, and not of the daily commuting type, whenever

26

employing H-2A workers.

The "incident of and necessary to the employment" language is not the only part of the DOL regulations that supports the conclusion that these long-distance transportation costs are primarily for the benefit of the employer. When evaluating expenses that are directly or indirectly related to employment, the examples in § 531.32 show a consistent line being drawn between those costs arising from the employment itself and those that would arise in the course of ordinary life. Section 531.32(a) begins by stating that "'other facilities,' as used in this section, must be something like board or lodging." Transportation costs–aside from regular commuting costs–are nothing like board or lodging. See Shultz v. Hinojosa, 432 F.2d 259, 267 (5th Cir. 1970)[18] ("We conclude that as used in the statute, the words 'other facilities' are to be considered as being in pari materia with the preceding words 'board and lodging.'"). In the list of examples which fall under "other facilities," costs that "primarily benefit the employee" are universally ordinary living expenses that one would incur in the course of life outside of the workplace.[19]

_____

[18] In Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[19] 29 C.F.R. § 531.32 lists "items that have been deemed to be within the meaning of the term [other facilities]":

27

Certain costs–for example, food for employees[20] and safety equipment used

Meals furnished at company restaurants or cafeterias or by hospitals, hotels, or restaurants to their employees; meals, dormitory rooms, and tuition furnished by a college to its student employees; housing furnished for dwelling purposes; general merchandise furnished at company stores and commissaries (including articles of food, clothing, and household effects); fuel (including coal, kerosene, firewood, and lumber slabs), electricity, water, and gas furnished for the noncommercial personal use of the employee; transportation furnished employees between their homes and work where the travel time does not constitute hours worked compensable under the Act and the transportation is not an incident of and necessary to the employment.

29 C.F.R. § 531.32(a).

Subsection (c) also lists items "which have been held to be primarily for the benefit or convenience of the employer and are not therefore to be considered 'facilities' within the meaning of section 3(m)":
Safety caps, explosives, and miners' lamps (in the mining industry); electric power (used for commercial production in the interest of the employer); company police and guard protection; taxes and insurance on the employer's buildings which are not used for lodgings furnished to the employee; "dues" to chambers of commerce and other organizations used, for example, to repay subsidies given to the employer to locate his factory in a particular community; transportation charges where such transportation is an incident of and necessary to the employment (as in the case of maintenance-of-way employees of a railroad); charges for rental of uniforms where the nature of the business requires the employee to wear a uniform; medical services and hospitalization which the employer is bound to furnish under [various laws].

Id. § 531.32(c).

29 C.F.R. § 531.3 also discusses items that are primarily for the benefit of the employer: The following is a list of facilities found by the Administrator to be primarily for the benefit of [sic] convenience of the employer. The list is intended to be illustrative rather than exclusive: (i) Tools of the trade and other materials and services incidental to carrying on the employer's business; (ii) the cost of any construction by and for the employer; (iii) the cost of uniforms and of their laundering, where the nature of the business requires the employee to wear a uniform.

Id. § 531.3(d)(2).

[20] "[M]eals are always regarded as primarily for the benefit and convenience of the employee." 29 C.F.R. § 531.32(c).

28

by employees[21]–categorically are either for the benefit of the employee or the

employer. Other categories are more nuanced; the costs are primarily for the

benefit of the employer or the employee depending on the specific facts. By

looking at items classified by the regulations as "other facilities", it is apparent that

the line is drawn based on whether the employment-related cost is a personal

expense that would arise as a normal living expense.[22]

Uniforms provide an illustration of this dividing line. "Charges for rental

uniforms," when required by the employment, are considered to be primarily for

the benefit of the employer. 29 C.F.R. § 531.32(c). Costs such as drycleaning,

ironing, or other special treatment must be reimbursed by the employer when such

expenses reduce wages below the minimum wage, and such uniform maintenance

is required by the nature of the work. See 29 C.F.R. § 531.3(d)(2) (stating that "the

cost of uniforms and of their laundering, where the nature of the business requires

the employee to wear a uniform," is an expense primarily for the benefit of the

employer). As to the question of what constitutes a required uniform, DOL has

---

[21] "Safety caps, explosives, and miners' lamps (in the mining industry)" are "primarily for the benefit or convenience of the employer." 29 C.F.R. § 531.32(c).

[22] An employer may consider utilities such as fuel and electricity as "other facilities" if they are "furnished for the noncommercial personal use of the employee." 29 C.F.R. § 531.32(a); see also id. § 531.32(c) (electric power that is "used for commercial production in the interest of the employer" is not "other facilities"). "[T]axes and insurance on the employer's buildings" is not a cost primarily for the benefit of the employee, unless they are "used for lodgings furnished to the employee." Id. § 531.32(c).

29

taken a practical approach; if the employer "merely prescribes a general type of ordinary basic street clothing to be worn while working and permits variations in details of dress[,] the garments chosen would not be considered uniforms . . ." Ayres v. 127 Rest. Corp., 12 F. Supp. 2d 305, 310 (S.D.N.Y. 1998) (quoting DOL Wage & Hour Field Operations Handbook § 30c12(f)).  As such attire would be considered "ordinary street clothing" rather than a uniform, the expense of purchasing and maintaining such clothing is an expense an employee would encounter as a normal living expense, and is therefore not primarily for the benefit of the employer.

2. Visa Costs

The Farmworkers' FLSA claim also demands reimbursement for their visa costs, visa application fees, and immigration fees for the entry documents, again up to the amount needed to comply with the minimum wage laws.  The visa costs here were necessitated by the Growers' employment of the Farmworkers under the H-2A program.  Unlike food, boarding, or commuter expenses, these fees are not costs that would arise as an ordinary living expense.   When an employer decides to utilize the H-2A program these costs are certain to arise, and it is therefore incumbent upon the employer to pay them.  Although immediate reimbursement is not necessary, payment may be required within the first week if the employees'

wages, once the costs are subtracted, are below minimum wage. If so, the employer must provide reimbursement up to the point where the minimum wage is met. H-2A workers are nonimmigrant alien workers who obviously require visas; in fact, the Growers applied to the DOL for the admission of H-2A workers and then sought to locate workers willing to accept the H-2A visas. See Agreed Statement of Facts ¶ 4-5. Furthermore, the visas restricted the workers to the work described on the clearance order; at the conclusion of the work period specified in the clearance order or upon termination of the worker's employment (which ever occurred first), the H-2A visas required the workers to return to Mexico. Id. at ¶ 16.[23] By participating in the H-2A program, the Growers created the need for these visa costs, which are not the type of expense they are permitted to pass on to the Farmworkers as "other facilities."

### 3. Recruitment Fees

Like the travel and visa expenses, the Farmworkers contend that the recruitment fees charged by some of the village recruiters and Gonzalez-Rodriguez should be reimbursed to the Farmworkers under the FLSA. The district court held that the Growers are not responsible for payment of recruitment fees. The Farmworkers contend that the district court should have applied the common-law

---

[23] See supra n.2.

rules of agency, especially the "apparent authority" principle. In a case involving a federal statute that is silent as to the applicability of agency law, the Supreme Court has stated that the "apparent authority theory has long been the settled rule in the federal system." Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp., 456 U.S. 556, 567 (1982) ( applying apparent authority principle in an antitrust case, and citing appellate cases applying the principle to federal tax liability, bail bond fraud and securities fraud).[24] To be reimbursable, (1) these fees must not constitute "other facilities" and (2) there must be authority to hold the Growers liable for the unauthorized acts of their agents. Because the principles of agency law do not hold the Growers responsible for the recruitment fees, we need not discuss whether the recruitment fees are "other facilities."

The Farmworkers claim that the referral fees were payments necessary to recruit the workers, and that the Growers are responsible for the fees under the apparent authority principle of the law of agency. When applying agency principles to federal statutes, "the Restatement (Second) of Agency . . . is a useful beginning point for a discussion of general agency principles." Burlington Indus.

---

[24] As to the general applicability of common-law principles to federal statutes, the Supreme Court has held that "in order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law." United States v. Bestfoods, 524 U.S. 51, 63 (1998) (citation omitted). Nothing in the FLSA seeks to displace the principles of agency law.

32

v. Ellerth, 524 U.S. 742, 755 (1998). According to the Farmworkers, the fact that the Growers explicitly instructed Cervantes not to charge recruitment fees is immaterial: "The rules as to the liability of a principal for authorized acts, are applicable to unauthorized acts which are apparently authorized." Restatement (Second) of Agency § 159 (1958) (hereinafter Restatement); see also Gleason v. Seaboard Air Line Ry. Co., 278 U.S. 349, 355-57 (1929) (where there was "no want of authority in the agent," the Court held the railroad liable despite agent's desire to benefit only himself).

According to the Restatement, apparent authority is "created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement § 27. "Apparent authority is created by the same method as that which creates authority, except that the manifestation of the principal is to the third person rather than to the agent." Restatement § 27 cmt. a; see also Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 493 (5th Cir. 1974)[25] ("Both types of authority depend for their creation on some manifestations, written or spoken words or conduct, by the principal, communicated either to the agent (actual

---

[25]See supra n.18.

33

authority) or to the third party (apparent authority)." (citing Restatement §§ 26 & 27)).  The agreed statement of undisputed facts includes no words or conduct of the Growers which, reasonably interpreted, could have caused the Farmworkers to believe the Growers consented to have the recruitment fees demanded on their behalf.[26]  Because the Farmworkers have failed to allege facts to support the creation of apparent authority, the Growers are not liable for the recruitment fees.

*B.*     *Clearance Order Contract Claim*

The Farmworkers claim that the clearance order work contracts[27] entitle them to reimbursement for the cost of transportation between their home villages and Monterrey.[28]   Paragraph 17 of the contracts provides:

> For workers hired from beyond normal commuting distance, after completion of 50 percent of the work contract period, the employer

---

[26] The Farmworkers also did not allege in the factual allegations made in their amended complaint any words or conduct of the Growers that could have caused the Farmworkers to believe that the Growers consented to have the act done on their behalf.

[27] Neither party disputes that the clearance orders constituted valid contracts between the Growers and the Farmworkers.  See 20 C.F.R. §§ 653.501(d)(3), 655.202(b)(14); see also Okeelanta Corp. v. Bygrave, 660 So. 2d 743, 745-46 (Fla. 4th Dist. Ct. App. 1995) (clearance orders issued pursuant to the Wagner-Peyser Act of 1933, 29 U.S.C. § 49 et seq., a very similar federal statute for foreign agricultural workers, are employment contracts enforceable under Florida law).  Both parties also agree that Florida law governs.  See Jemco, Inc. v. United Parcel Serv., Inc., 400 So. 2d 499, 500-01 (Fla. 3d Dist. Ct. App. 1981).

[28] Although the parties dispute from which point the travel costs must be reimbursed, the timing of when the reimbursement must take place is clear and unambiguous from the contract.

shall reimburse the worker for costs incurred by the worker for transportation and daily subsistence, as required by DOL regulations, from the place from which the worker has come to work for the employer to the place of employment. If the worker completes the work contract period, the employer will provide or pay for the worker's transportation and daily subsistence from the place of employment to the place from which the worker, disregarding intervening employment, came to work for the employer . . . .

Under Florida law, courts must give effect to the plain language of contracts when that language is clear and unambiguous. See Hamilton Constr. Co. v. Bd. of Pub. Instruction of Dade County, 65 So. 2d 729, 731 (Fla. 1953). Whether a contract provision is ambiguous is a question for the court. See Strama v. Union Fid. Life Ins. Co., 793 So. 2d 1129, 1132 (Fla. 1st Dist. Ct. App. 2001).

Here, each party argues that the phrase "from the place from which the worker has come to work for the employer" is clear and unambiguous, and each party contends that the agreement has only one reasonable interpretation. The Farmworkers assert that the phrase means the home villages from which the workers traveled to Monterrey. Indeed, "[t]he place from which the worker has come to work" can reasonably be read to mean the home village of the worker. Alternatively, the Growers contend that the place from which the worker has come to work is Monterrey, as that was the place where the workers gathered, where they were selected to be employees, and from where they traveled collectively to the farms in Florida. This reading of the language is equally reasonable. As both

35

interpretations provide reasonable constructions, the phrase is clearly ambiguous. See Royal Am. Realty, Inc. v. Bank of Palm Beach and Trust Co., 215 So. 2d 336, 338 (Fla. 4th Dist. Ct. App. 1968) (holding that contract language is ambiguous where "it is, in fact, reasonably or fairly susceptible to the different constructions being advocated by the parties"). In finding that the phrase clearly and unambiguously meant Monterrey, the district court therefore erred.

Because the facts of this case are undisputed, the court resolves the ambiguity as a matter of law. See Strama, 793 So. 2d at 1132. When a contract is ambiguous, Florida law provides rules of construction to infer the meaning. See generally 11 Fla. Jur. 2d Contracts §§ 139-206 (1997). To construe the contract, "one part of an agreement may be resorted to for the explanation of the meaning of the language of another part." Mount Vernon Fire Ins. Co. v. Editorial Am., S.A., 374 So. 2d 1072, 1073 (Fla. 3d Dist. Ct. App. 1979) (citing Pensacola Gas Co. v. A. Lotze's Sons & Co., 2 So. 609 (1887)). Here, the contract provision was clearly derived from H-2A regulations; paragraph 17 refers to reimbursement "as required by DOL regulations," and the actual language at issue is identical to that in 20 C.F.R. § 655.102(b)(5). Therefore, if cases or regulations governing the H-2A program have given the phrase a "definite legal meaning," such definition would govern. Wilcox v. Atkins, 213 So. 2d 879, 881 (Fla. 2d Dist. Ct. App. 1968).

36

Neither party points to an applicable case or regulation;[29] our review of the Code of Federal Regulations and the Federal Register found the phrase being used but not defined. See, e.g., 20 C.F.R. § 655.202(b)(5)(ii); 64 Fed. Reg. 34958 (June 29, 1999); 52 Fed. Reg. 20496 (June 1, 1987).

We now review the rules of construction in Florida contract law to see if any provide guidance. To ascertain the intent of the parties, courts may "receive evidence extrinsic to the contract for the purpose of determining the intent of the parties at the time of the contract." See Gulf Cities Gas Corp. v. Tangelo Park Serv. Co., 253 So. 2d 744, 748 (Fla. 4th Dist. Ct. App. 1971); see also First Capital Income & Growth Funds, Ltd.-Series XII v. Baumann, 616 So. 2d 163, 165 (Fla. 3d Dist. Ct. App. 1993) (holding that parol evidence can be presented when the terms of the agreement are ambiguous). Courts also can consider circumstances surrounding the parties at the time the contract was made. See Clark v. Clark, 79 So. 2d 426, 428 (Fla. 1955). Additionally, "custom and usage" may be considered in construing ambiguous terms. See Farr v. Poe & Brown, Inc., 756 So. 2d 151, 152-53 (Fla. 4th Dist. Ct. App. 2000). Furthermore, certain public policy concerns

---

[29] The Farmworkers cite to 56 Fed. Reg. 20477 (May 3, 1991), which states: "The alien worker contract must show the actual place where the worker was recruited for purposes of determining transportation and subsistence costs. Contract language which in the past 'deemed' the place of recruitment to be Kingston, Jamaica, is not permissible." Here, the parties disagree as to where the worker was recruited–Monterrey or the various home villages–and the contract provides no insight; therefore, this citation does not create a definite legal meaning.

37

can assist construction of contracts as well.  See Sch. Bd. of Broward County, Fla.

v. Great Am. Ins. Co., 807 So. 2d 750, 752 (Fla. 4th Dist. Ct. App. 2002).

None of these rules of construction from Florida law assists us in the instant

case.  For example, there is no extrinsic evidence to consider beyond the document

itself.[30]  When "ambiguity in meaning remains after resort to the ordinary rules of

construction," an ambiguous term is to be construed against the drafter.  Excelsior

Ins. Co. v. Pomona Park Bar & Package Store, 369 So. 2d 938, 942 (Fla. 1979);

see also City of Homestead v. Johnson, 760 So. 2d 80, 84 (Fla. 2000) ("An

ambiguous term in a contract is to be construed against the drafter."); Sch. Bd. of

Broward County, 807 So. 2d at 752 (describing this as a "secondary rule of

interpretation" and a "last resort" to be invoked after considering "all of the

ordinary interpretative guides").  This is especially so where there is no evidence of

intent beyond the contract itself.  In Child v. Child, 474 So. 2d 299 (Fla. 3d Dist.

Ct. App. 1985), the court stated:

> The "construction-against-the-draftsman" rule, like all such tenets, is
> designed as a means to reach the end-all of every problem of

---

[30] The district court believed that the employment relationship did not commence until the workers were approved in Monterrey, and that expenses prior to the start of the employment relationship would not be reimbursable under the terms of the contract.  However, the start of the employment relationship does not clarify the meaning of the contract term.  Certainly the contract does not cover those who came to Monterrey in search of employment but were not accepted.  That those who were accepted as employees would be reimbursed for their travel costs from their home villages to Monterrey remains a reasonable reading of the contract provision.

contractual interpretation: the intent of the parties. When that intent does not clearly appear from the words of the contract itself–that is, when it is deemed "ambiguous"–the against-the-drafter rule may be of some value when the extrinsic evidence on the ultimate intent issue is itself inconclusive; it may be decisive when, as in the case of contracts of adhesion such as insurance policies, there is no other evidence at all of intent beyond the words themselves.

Id. at 301 (footnotes and citations omitted). As here there is no evidence of intent beyond the words of the contract, the ambiguous term is construed against the drafter, the Growers.[31] See Gaines v. MacArthur, 254 So. 2d 8, 11 (Fla. 3d Dist. Ct. App. 1971).

A policy reason supporting this rule of construction is that "the party against whom it operates had the possibility of drafting the language so as to avoid the dispute." 2 E. Allan Farnsworth, Farnsworth on Contracts §7.11 (2d ed. 1998); see also 11 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 32:12 (4th ed. 1999); Restatement (Second) of Contracts § 206 (1981). Here, the Growers easily could have avoided this situation by providing much clearer language as to the point from which transportation had to be reimbursed; the Growers could have stated "the place where the worker was hired" or named

_____

[31] The Growers drafted the contract as it is they who prepared and submitted the H-2A clearance orders to DOL for acceptance; the clearance orders were then accepted by the DOL. In the clearance orders, the Growers agree to provide a copy of the job clearance order to the worker no later than the worker's first day of work, and the clearance order is a contract. See supra n.27.

39

Monterrey specifically.

### III.  CONCLUSION

We AFFIRM the district court's entry of summary judgment for the Growers as to the Farmworkers' FLSA claim for recruitment fees; we REVERSE the entry of summary judgment as to the Farmworkers' FLSA claim for transportation costs, visa expenses and immigration fees, as well as the Farmworker's contract claim. This case is REMANDED to the district court for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.