**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 23-10645

————————————————

SHANE VILLARINO,
LAURA KAREN JOHNSON,
JEFFERY MONDY,
JEROME GUNN,
   on behalf of themselves and all others
   similarly situated,

*Plaintiffs-Appellants,*

*versus*

PACESETTER PERSONNEL SERVICE, INC.,
PACESETTER PERSONNEL SERVICE OF FLORIDA, INC.,
FLORIDA STAFFING SERVICE, INC.,
TAMPA SERVICE COMPANY, INC.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 0:20-cv-60192-AHS

_____

Before NEWSOM, GRANT, and ABUDU, Circuit Judges.

GRANT, Circuit Judge:

Pacesetter Personnel Service matches workers with employers for temporary labor on a day-to-day basis. To ensure that those workers arrive at their jobsites on time and prepared, the company offers transportation and tools to workers who need them. Both can be accessed at the Pacesetter labor hall where job tickets are offered and accepted. Some of the workers were not so happy with this arrangement, so they sued Pacesetter for a variety of labor-law violations. They say the company cannot deduct transportation costs from their paychecks, and that it should pay them for travel time, tool-collection time, and waiting time.

The district court sided with Pacesetter, and we agree. Because the transportation offered is optional and provided for the benefit of employees, Pacesetter can deduct the costs for those workers who choose to use it. As for the three categories of time, none are integral and indispensable to the core activities of the jobs, so the Fair Labor Standards Act does not require that workers be paid for that time. We thus affirm.

## I.

Pacesetter Personnel Service provides temporary labor to clients in various industries across the Southeast, ranging from construction to hospitality. Would-be employees known as "daily ticket workers" gather at a Pacesetter labor hall, signing in to say that they are available to work that day. Any worker who receives a job offer is given a ticket that includes a start time, the worksite's location, and any suggested or required equipment.

Pacesetter's transportation agreement advises the daily ticket workers that it is their responsibility to arrive at assigned jobs on time. That same agreement, signed by workers, provides several options for getting to and from worksites—the worker's own vehicle, public transportation, Pacesetter vans, or carpools in coworkers' cars. Pacesetter deducts $3.00 per day ($1.50 each way) from the paychecks of those workers who ride in a carpool or van and pays carpool drivers $1.50 for each person driven per leg of the trip.

Many jobs require tools, and here too workers have options. They can either bring their own or use Pacesetter's—basic items like goggles, gloves, shovels, masks, and work boots. Workers who fail to return the equipment after work are eventually charged for it, but that is typically a last resort after unfruitful attempts to retrieve the tools. In most cases, at day's end the workers return to the labor hall, give back the equipment, and get paid.

Shane Villarino and around 300 other daily ticket workers in Broward County, Florida, brought a hybrid collective and class

action lawsuit against Pacesetter in 2020. They alleged, among other things, that Pacesetter violated the Fair Labor Standards Act and the Florida Minimum Wage Act for two reasons.[1] *First*, they say that Pacesetter's deductions for transportation charges mean workers were ultimately paid less than the minimum wage. *Second*, they say that Pacesetter should have paid workers for their travel time to and from jobsites, as well as for the time spent waiting at the labor hall and returning tools. The class also alleged that Pacesetter violated the Florida Labor Pool Act by charging workers above the statutory limit for transportation to and from labor sites. *See* Fla. Stat. § 448.24(1)(b).

In a series of orders, the district court granted in part and denied in part Villarino's attempts to certify several classes of plaintiffs. And while several class-certification motions were pending, the parties cross-moved for summary judgment. The district court denied Villarino's motion for summary judgment in its entirety, and granted Pacesetter's motion for summary judgment on Villarino's Fair Labor Standards Act and Florida Minimum Wage Act claims.[2] Villarino now appeals those decisions, as well as the district court's earlier refusal to certify a

---

[1] The Florida Minimum Wage Act adopts many of the statutory and regulatory provisions of the Fair Labor Standards Act. *See* Fla. Stat. § 448.110(3).

[2] The court also granted summary judgment to Pacesetter on Villarino's claim that Pacesetter had violated the Florida Labor Pool Act by charging above market value or the actual cost for equipment. Villarino does not appeal that decision.

subclass of plaintiffs bringing excessive-transportation-charge claims under the Florida Labor Pool Act.

## II.

We review the district court's grant of summary judgment de novo, viewing the evidence in the light most favorable to Villarino and drawing all inferences in his favor. *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1383 (11th Cir. 2024). Summary judgment is appropriate if "there is no genuine dispute as to any material fact" meaning that Pacesetter is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We review the denial of class certification under Rule 23 for abuse of discretion. *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1300 (11th Cir. 2021). Factual determinations are reviewed for clear error and legal determinations de novo. *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1265 (11th Cir. 2009).

## III.

We proceed in three parts, considering Villarino's transportation deduction and unpaid time claims, as well as his disagreement with one of the district court's class certification decisions.

## A.

Villarino first argues that Pacesetter was wrong to deduct Pacesetter-arranged transportation from the daily pay of the workers who used those services. This deduction, Villarino says, "resulted in pay of less than the applicable minimum wage,"

6                    Opinion of the Court                    23-10645

violating the Fair Labor Standards Act and the Florida Minimum Wage Act.  We disagree.[3]

It's true that under the Fair Labor Standards Act an employer cannot shift business expenses to its employees if that shift would reduce employees' wages below the statutory minimum—that kind of end run around the FLSA is impermissible. 29 U.S.C. § 206(a)(1); *see Ramos-Barrientos v. Bland*, 661 F.3d 587, 594 (11th Cir. 2011).  *All* employers face costs of doing business, and allowing them to simply strip those costs out of employees' wages would quickly neuter any pretense of a true minimum wage.

But the rule is not that expenses can never be deducted from wages—it is that expenses cannot be shifted to employees when they are "for the employer's benefit."  29 C.F.R. § 531.35; *see also Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1236 (11th Cir. 2002).  So whether Pacesetter's transportation deductions are allowed under the FLSA depends on whether the transportation it

---

[3] Because neither Pacesetter's motion for summary judgment nor the district court's order granting that motion expressly addressed whether Pacesetter violated the Fair Labor Standards Act when it charged workers for transportation, Villarino says he was deprived of notice and an opportunity to respond on this claim.

That is incorrect.  Villarino himself raised this issue in his motion for summary judgment, which the district court denied after both parties briefed the issue. Villarino cannot now claim that he lacked notice to address an issue he himself raised.  *Cf. Denis v. Liberty Mut. Ins. Co.*, 791 F.2d 846, 850 (11th Cir. 1986); *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213 (11th Cir. 1995).

provided for workers was "primarily for the benefit or convenience of the employer." 29 C.F.R. § 531.32(c). It was not.

To start, the company's transportation agreement tells workers that once they are assigned to a job—and accept it—it is their own "responsibility to arrive at that job/customer/work site by the time designated in [their] Time Ticket." And that same agreement emphasizes that workers have several "options" to get to jobsites, including their own vehicles, public transit, Pacesetter vans, or a carpool. The evidence backs this up—the company's regional vice president testified that customers never require workers to be dropped off by Pacesetter at a jobsite, and confirmed that workers can take their transportation of choice, including a van, carpool, public transit, or rideshare service.

In fact, the workers' own deposition testimony confirms two things: they knew they had options, and they used them. One worker said he varies between a Pacesetter van, a carpool, or a bus. Another explained that Pacesetter never told him he could not drive himself to work. And a third testified that no one instructed her which form of transportation to use. The bottom line is that if workers needed transportation the company would assign it, but they remained free to choose other options—and did so regularly.

No doubt, organizing transportation for those who needed it likely helped Pacesetter live up to its promise of a "comprehensive employee transport system" that provided "dependable, timely general labor" for clients. But the fact that Pacesetter also benefited from the options it offered employees

does not mean that the company's system was built to serve its own interests rather than those of the workers.[4]  Consider a company snack bar or cafeteria offering breakfast before work. Would it be an illegal kickback to charge workers for a bagel or coffee simply because that option made it easier for them to be nourished and energetic at work?  Obviously not.  And in any event, according to one employee's testimony, the company did not advertise that it would "deliver workers to job sites" as a competitive advantage against other firms.

Villarino contends that our decision in *Arriaga v. Florida Pacific Farms* compels a different result.  305 F.3d 1228.  There, we concluded that the transportation costs for workers' trips from Mexico under the H-2A visa program were an "incident of and necessary to" their employment—in other words, benefited the employer—and thus the workers could not be made to pay them. *Id.* at 1242.  But cross-border travel under an international worker program is not comparable to the job-hall-to-worksite

---

[4] Pacesetter's argument that 29 U.S.C. § 203(m)(1) allows employers to count certain non-cash benefits—room, board, and "other facilities"—as part of an employee's total wages to meet the minimum wage is true.  *See* 29 C.F.R. § 531.32(a), (c).  But because neither party contends that Pacesetter's cash wages do not meet the minimum wage in the first place, this rule is beside the point—it would only matter if Pacesetter was relying on the value of the transportation services to meet the minimum wage.  And so long as the prices Pacesetter charged for transportation did not "exceed the 'reasonable cost'" of that transportation, which no one is arguing at this stage of the case, deductions could be made "even if they reduce the cash wage below the minimum wage." *Id.* § 531.36(a).

transportation we consider here. Pacesetter workers' transportation is more like ordinary commuting that Department of Labor regulations already make clear are to benefit employees, not employers. *See* 29 C.F.R. § 531.32(a); *Arriaga*, 305 F.3d at 1242.

The transportation is an optional benefit distinct from the "free and clear" minimum wage that workers already receive. 29 C.F.R. § 531.36(a). That means Pacesetter can lawfully deduct the workers' transportation costs from their wages without running afoul of the Fair Labor Standards Act and the Florida Minimum Wage Act.

**B.**

Villarino's next claim is that workers should have been paid for the time they spent (1) traveling to and from worksites, (2) collecting tools for their respective jobs, and (3) waiting for transportation. He says Pacesetter's failure to pay for this time violated the Fair Labor Standards Act and its Florida equivalent.

That's true only if traveling, collecting tools, or waiting is part of the core work that the workers were hired to perform—in other words, whether any of these was an "integral and indispensable part of the principal activities" of the job. *Integrity Staffing Sols., Inc., v. Busk*, 574 U.S. 27, 33 (2014) (quotation omitted); Portal-to-Portal Act, 29 U.S.C. § 254(a)(1). And an activity is "integral and indispensable" if it is "an intrinsic element" of the principal activities—something that an employee must perform to carry out her primary duties. *Busk*, 574 U.S. at 33. None of these meets the test.

**1.**

We begin with the travel-time claim.  The Portal-to-Portal Act amended the FLSA to exempt from compensation the time workers spend "traveling to and from the actual place of performance of the principal activity or activities."  29 U.S.C. § 254(a)(1).  That explains why "[n]ormal travel from home to work is not" compensable as "worktime."  29 C.F.R. § 785.35.  The fact that workers need to get to their jobs in order to do them is not enough—if "mere causal necessity was sufficient to constitute a compensable activity, all commuting would be compensable because it is a practical necessity."  *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1344 (11th Cir. 2007).  And that would make the Portal-to-Portal Act a dead letter.

What's more, ordinary commutes do not become compensable just because an employer provides the transportation.  The Department of Labor itself characterizes riding "between a town and an outlying mine or factory" as an example of "walking, riding, or traveling" that is "preliminary" or "postliminary" to the workday and thus noncompensable.  29 C.F.R. § 790.7(f).  The same is true for "riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted."  *Id.*

Indeed, the Labor Department's own Field Operations Handbook—in a section addressing temporary labor firms like Pacesetter—explains that travel from a central location to a

customer's establishment and back is noncompensable.[5]   U.S. Dep't of Labor, Wage and Hour Division, *Field Operations Handbook* 31c09 (Aug. 10, 2016).  "In other words," the handbook explains, the employee's "working time is computed in the same manner as if he or she had gone directly from his or her home to the customer's establishment and returned home from there at the end of the day." *Id.*  Though we are not bound by that guidance, we find it persuasive, and conclude that the time Pacesetter workers spend traveling to and from worksites is not compensable. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Villarino disagrees.  He does not argue that the employees are performing any work before or during their travel time, but says that the time is compensable because they "were required to report to the Pacesetter labor hall."  That requirement is not enough.  If the integral-and-indispensable test could be "satisfied merely by the fact that an employer required an activity"—as Villarino would have it—the test "would sweep into 'principal activities' the very activities that the Portal-to-Portal Act was designed to address," including time spent "walking, riding, or

---

[5] We note that for this provision to apply, the "employment understanding" must "clearly" be that the employee's pay or work "begins and ends at the customer's establishment."  U.S. Dep't of Labor, Wage and Hour Division, *Field Operations Handbook* 31c09 (Aug. 10, 2016).  That condition is satisfied here.

traveling to and from the actual place" of employment.[6]  *Busk*, 574 U.S. at 36; 29 U.S.C. § 254(a)(1).

**2.**

Villarino next argues that because Pacesetter-issued tools were "integral and indispensable" to workers' principal job duties, they must be paid for the time spent collecting and returning those tools to Pacesetter's labor hall.

The Portal-to-Portal Act once again governs.  In this context, the test is whether a non-travel activity "preliminary to or postliminary to" a worker's "principal activity" is integral and indispensable to that activity.  29 U.S.C. § 254(a)(2); *see Busk*, 574 U.S. at 33.    Those two words have different meanings: "indispensable is not synonymous with integral." *Llorca v. Sheriff, Collier Cnty.*, 893 F.3d 1319, 1323 (11th Cir. 2018) (alteration adopted and quotations omitted).  So to qualify, a worker's activities must be integral, which means that they must form an "intrinsic portion or element" of her principal activities.  *Busk*, 574 U.S. at 33

---

[6] It is true that travel from a central meeting spot like Pacesetter's to another jobsite "must be counted as hours worked" when employees are "required" to report at the meeting place "to receive instructions." 29 C.F.R. § 785.38. Even so, the nature of the daily ticket workers' employment makes that regulation inapplicable here.  The workers decide for themselves "when, if, and for what days they wish to seek and accept assignments," and report to Pacesetter's labor hall accordingly.  Arriving at the labor hall on their own initiative to (hopefully) secure work is, by definition, not a "require[ment]" to do anything.  *Id.*  It therefore does not make the workers' travel time compensable under the FLSA.

(quotation omitted).  The activities must also be indispensable, which means that they "cannot be dispensed with, remitted, set aside, disregarded, or neglected."  *Id.* (quotation omitted).  So "[e]ven activities required by the employer and for the employer's benefit" remain outside the bounds of the employee's principal activity if they are "not integral and indispensable to 'the productive work that the employee is employed to perform.'" *Balestrieri v. Menlo Park Fire Prot. Dist.*, 800 F.3d 1094, 1101 (9th Cir. 2015) (emphasis omitted) (quoting *Busk*, 574 U.S. at 36).  And just because "certain preshift activities are necessary for employees to engage in their principal activities" does not mean they qualify. *IBP, Inc. v. Alvarez*, 546 U.S. 21, 40–41 (2005).

On this record, tool collection and return are not an indispensable part of the daily ticket workers' duties.  As discussed, the daily ticket workers voluntarily select which days to work "at their sole discretion."  Some jobs do not require tools, and for others Pacesetter clients will supply tools at the jobsite.  And Pacesetter also allows workers to bring their own tools if they wish. Some—including Villarino—do.  What's more, picking up generic equipment—hard hats, safety vests, gloves, brooms, rakes, and shovels—"may or may not be necessary in particular situations or for every employee." *Id.* at 40.  While tools can increase the length of a daily ticket worker's employment, a worker may even arrive at a jobsite without the recommended tool and still receive work. That makes this case unlike *Alvarez*, where "the donning of certain types of protective gear"—in hazardous occupations, for

example—was deemed "always essential if the worker is to do his job." *Id.* (emphasis omitted).

Because daily ticket workers may bring their own equipment, and not all jobs require tools in any event, we cannot say that *some* employees' collection and return of equipment on *some* days for *some* jobs is a constituent duty that "cannot be dispensed with, remitted, set aside, disregarded, or neglected" if workers are to perform their principal activities. *Busk*, 574 U.S. at 33 (quoting 5 *Oxford English Dictionary* 219 (1933)). Examples from other cases are consistent with this conclusion. A firefighter's "collecting and loading" his turnout gear and "driving it to a station" qualified as preliminary and thus "uncompensable under the Act." *Balestrieri*, 800 F.3d at 1098. So too for the time sheriff's deputies spent "donning and doffing protective gear" before commencing their "law enforcement duties." *Llorca*, 893 F.3d at 1324. By contrast, a radiological technologist's pre-shift activities of turning on an X-ray machine and performing tests "to prepare the office for receiving patients" qualified as integral and indispensable to her principal employment duties because the equipment needed to be operable as soon as the office opened to patients. *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 715, 718 (2d Cir. 2001).

In short, the daily ticket workers' collection of nonspecialized tools used in the mine run of manual labor jobs does not meet that benchmark. *See* 29 C.F.R. § 790.7(d). The time

workers spend collecting and returning tools is noncompensable under the FLSA.

**3.**

We turn now to Villarino's waiting-time claim. He argues that Pacesetter needed to compensate workers "for all time after receiving their daily work ticket." The reason? Workers, he says, were compelled "to wait for Pacesetter-assigned/coordinated transportation to take them to the job site," so they "could not use this time effectively for their own purposes." Not so.

As before, the compensability of the workers' wait time hinges on whether it was integral and indispensable to their principal activities. *See Busk*, 574 U.S. at 32–33. The Field Operations Handbook again provides a helpful starting point: time spent "waiting for assignments" at a central location is noncompensable. *Handbook* 31c09. Supreme Court precedent offers helpful data points too. In one case, "the time battery-plant employees spent showering and changing clothes" was integral and indispensable to their work—and thus compensable—"because the chemicals in the plant were 'toxic to human beings.'" *Busk*, 574 U.S. at 34 (quoting *Steiner v. Mitchell*, 350 U.S. 247, 249 (1956)). And in another, "the time meatpacker employees spent sharpening their knives" was compensable "because dull knives would 'slow down production' on the assembly line, 'affect the appearance of the meat as well as the quality of the hides,' 'cause waste,' and lead to 'accidents.'" *Id.* (quoting *Mitchell v. King Packing Co.*, 350 U.S. 260, 262 (1956)).

On the other hand, "the time poultry-plant employees spent waiting to don protective gear" was noncompensable because such waiting was not closely related to "the productive activity on the assembly line." *Id.* (quoting *Alvarez*, 546 U.S. at 42). And "the employees' time spent waiting to undergo and undergoing [an employer's] security screenings" was noncompensable for warehouse staffers in *Busk*. *Id.* at 37.

The distinctions in those cases support our conclusion that the workers' waiting time is a noncompensable preliminary activity. *See* 29 U.S.C. § 254(a)(2). To start, workers did not even need to wait for transportation—under the transportation agreement, they could proceed directly to the jobsite if they wished.[7] And the daily ticket workers themselves decide "when, if, and for what days they wish to seek and accept assignments."

Not getting paid for time spent at the job hall came as no surprise: several workers also testified to recognizing that they were compensated only for time spent working at jobsites. That makes them subject to the Department of Labor's conclusion that if "the employment understanding clearly is that the pay or the time of the employee begins and ends at the customer's establishment, waiting for assignments at the central location or in

---

[7] Even if Pacesetter required workers to wait for transportation, that would not make this time integral and indispensable to their principal activities at their respective jobsites. That is because "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*"—not "whether an employer *required* a particular activity." *Busk*, 574 U.S. at 36.

23-10645          Opinion of the Court               17

travel from there to the customer's establishment and return would not be compensable worktime."[8]  *Handbook* 31c09; *see also Bonilla*, 487 F.3d at 1341.

On top of that, workers typically used their waiting time—both for assignments and for Pacesetter transportation—doing as they pleased.  One testified that he watched the news or went to buy coffee while waiting for a job assignment.  Another added that he would sit in the waiting room, sleep, go outside to smoke a cigarette, or pop by a food store to buy coffee.  These personal activities are well removed "from the productive activity" that the workers were hired to perform at their respective jobsites, meaning their waiting time comfortably qualifies as preliminary activity. *Alvarez*, 546 U.S. at 42.

In sum, because the workers' wait time was neither "the principal activity or activities" that they were hired to perform nor "integral and indispensable" to their job duties, it was not compensable under the FLSA.  *Busk*, 574 U.S. at 35 (quotation omitted).

---

[8] Here, we note a Department of Labor audit finding that Pacesetter had committed no minimum-wage violations at its Orlando, Florida, labor hall between 2016 and 2018.  The audit report stated that "the time waiting for assignment or travelling from the central location to the worksite is not compensable."  Pacesetter attested that the policies at all Florida locations were the same during the relevant period.

## C.

Having rejected Villarino's substantive claims, we turn to his argument that the district court abused its discretion by refusing to certify the excessive-transportation-charge subclass under the Florida Labor Pool Act. Though the district court certified certain subclasses and refused to certify others, Villarino challenges only the denial of the class of workers alleging that some workers were charged more than the $1.50 each way that Florida law permits for transportation. *See* Fla. Stat. § 448.24(1)(b).

The district court determined that this class failed Federal Rule of Civil Procedure 23(b)(3), which permits class certification if (among other things) "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." But "certification is inappropriate" under this provision if plaintiffs must "introduce a great deal of individualized proof or argue a number of individualized legal points to establish most or all of the elements of their individualized claims." *Sellers v. Rushmore Loan Mgmt. Servs., LLC*, 941 F.3d 1031, 1040 (11th Cir. 2019) (quotation omitted).

Here the court determined that resolving the transportation-subclass claims would "require extensive amounts of individualized proof that would predominate." Villarino contends that the class should be certified because Pacesetter's own records provide the necessary information, listing "each daily charge in excess of $3.00 for transportation." And he insists that

even if there are "individual fact determinations with respect to charges," these issues "depend on objective criteria that can be organized by a computer." *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1112 (5th Cir. 1978).[9]

Villarino oversimplifies the issue. Resolution of the subclass's claims would require individualized determinations on both damages and liability. Sometimes Pacesetter gave workers transportation credits, though for what it is not entirely clear. And other workers were charged more than $3.00 for transportation on certain days. Some of these records specify that an excess charge was for a work-related bus pass, but others lack any explanation at all. Pacesetter asserts that these latter charges were for daily ticket workers to purchase bus passes for personal use, which the company provided to workers at a discount—and at a loss. These charges have nothing to do with wages and would not violate the Florida statute, but it is unclear from the Pacesetter records which transportation charges were business and which were personal.

All that to say, rather than just examining Pacesetter's records, the district court would have to scrutinize each overcharge or transportation credit. That would involve a lengthy and particularized inquiry—in essence, a series of mini-trials—for countless individual plaintiffs. Determining the legality of deductions would thus devolve "into an unmanageable variety of individual legal and factual issues." *Andrews v. Am. Tel. & Tel. Co.*,

---

[9] *Roper* is binding precedent in the Eleventh Circuit under *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

95 F.3d 1014, 1023 (11th Cir. 1996), *overruled on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  On this record, we cannot conclude that the district court abused its broad discretion in refusing to certify this subclass of plaintiffs.

★      ★      ★

Pacesetter is entitled to summary judgment on Villarino's Fair Labor Standards Act and Florida Minimum Wage Act claims. And the district court acted within its discretion in not certifying the transportation subclass.  We therefore **AFFIRM**.